### SHEPLEY ET AL. *v.* COWAN ET AL.

1. Whenever, in the disposition of the public lands, any action is required to be taken by an officer of the land department, all proceedings tending to defeat such action are impliedly inhibited. Accordingly, where an act of Congress of 1812 directed a survey to be made of the out-boundary line of the village of Carondelet, in the State of Missouri, so as to include the commons claimed by its inhabitants, and a survey made did not embrace all the lands thus claimed, the lands omitted were reserved from sale until the approval of the survey by the land department, and the validity of the claim to the omitted lands was thus determined.

2. Where a State seeks to select lands as a part of the grant to it by the eighth section of the act of Congress of Sept. 4, 1841, and a settler seeks to acquire a right of pre-emption to the same lands, the party taking the first initiatory step, if the same is followed up to patent, acquires the better right to the premises. The patent relates back to the date of the initiatory act, and cuts off all intervening claimants.

3. The eighth section of the act of Sept. 4, 1841, in authorizing the State to make selections of land, does not interfere with the operation of the other provisions of that act regulating the system of settlement and pre-emption. The two modes of acquiring title to land from the United States are not in

conflict with each other.  Both are to have full operation, that one control-ling in a particular case under which the first initiatory step was had.

4. Whilst, according to previous decisions of this court, no vested right in the public lands as *against the United States* is acquired until all the prerequisites for the acquisition of the title have been complied with, parties may, as against each other, acquire a right to be preferred in the purchase or other acquisition of the land, when the United States, have determined to sell or donate the property.  In all such cases, the first in time in the commence-ment of proceedings for the acquisition of the title, when the same are regu-larly followed up, is deemed to be the first in right.

5. Where a party has settled upon public land with a view to acquire a right of pre-emption, the land being open to settlement, his right thus initiated is not prejudiced by a refusal of the local land-officers to receive his proofs of settlement, upon an erroneous opinion that the land is reserved from sale.

6. The rulings of the land department on disputed questions of fact, made in a contested case as to the settlement and improvements of a pre-emption claimant, are not open to review by the courts when collaterally assailed.

7. The officers of the land department are specially designated by law to receive, consider, and pass upon proofs presented with respect to settlements upon the public lands, with a view to secure rights of pre-emption.  If they err in the construction of the law applicable to any case, or if fraud is practised upon them, or they themselves are chargeable with fraudulent practices, their rulings may be reviewed and annulled by the courts when a contro-versy arises between private parties founded upon their decisions.  But, for mere errors of judgment upon the weight of evidence in a contested case before them, the only remedy is by appeal from one officer to another of the department, and perhaps, under special circumstances, to the President.

ERROR to the Supreme Court of the State of Missouri.

The facts are stated in the opinion of the court.

*Mr. John R. Shepley* and *Mr. P. Phillips* for the plaintiff in error.

*Mr. Montgomery Blair* and *Mr. Britton A. Hill, contra.*

MR. JUSTICE FIELD delivered the opinion of the court.

This is a suit in equity, brought, according to the practice obtaining in Missouri, to settle the conflicting claims of the parties, arising from their respective patents, to a fractional section of land comprising thirty-seven acres and two-fifths of an acre, situated in that State.  The plaintiffs assert title to the premises under a patent issued to William M. McPher-son by the governor of the State, bearing date on the 27th of February, 1850, purporting to be for lands selected under the eighth section of the act of Congress of Sept. 4, 1841, entitled "An act to appropriate the proceeds of the sales of the public

lands, and to grant pre-emption rights " (5 Stat. 453); and the defendants claim title to the premises under a patent of the United States, bearing date on the 21st of July, 1866, issued to the heirs of Thomas Chartrand upon an alleged pre-emption right acquired by a settlement of their ancestor.

The eighth section of the act of Sept. 4, 1841, declared that there should be granted to each State specified in its first section — and among them was the State of Missouri — five hundred thousand acres of land for purposes of internal improvement, the selection of the land in the several States to be made within their respective limits, in such manner as the legislatures thereof should direct, but in parcels conformably to sectional divisions and subdivisions of the public surveys, and of not less than three hundred and twenty acres in each, from any public land except such as was or might be reserved from sale by any law of Congress or proclamation of the President. Several acts were passed by the legislature of Missouri for the selection and disposition of the land thus granted. One of them, passed on the 10th of March, 1849 (Laws of Missouri of 1849, p. 64), authorized the governor of the State to, dispose, at private sale, of so much of the land as then remained to be selected, and to issue to the purchasers certificates empowering them to locate the quantity purchased, in conformity with the act of Congress. The purchasers were to inform the governor of the lands selected, and he was to notify the Secretary of the Treasury that the selections were made for the State ; and, if approved by the secretary, patents were to issue to the purchasers.

Where the land selected in any instance contained less than three hundred and twenty acres, the governor was required, upon the request of the purchaser and upon payment for the full amount, to relinquish the surplus to the United States. Of the certificates thus issued, one was held by William M. McPherson ; and under it a selection was made by him of the premises in controversy. Of this selection the governor of the State informed the Secretary of the Treasury on the 15th of December, 1849, and requested his approval of it ; at the same time relinquishing to the United States the surplus between the amount selected and three hundred and twenty acres. At

that time the supervision of the land-office had been transferred from the Secretary of the Treasury to the Secretary of the Interior, whose department was created in March of that year. The selection of McPherson was accordingly brought to the latter's attention, and was approved by him on the 17th of January following; subject, however, to any rights which may have existed at the time the selection was made known to the land-officers by the agent of the State. On the 27th of February following, a patent of the State of Missouri for the premises was issued to McPherson by the governor. Upon the title thus conferred the plaintiffs repose, and ask judgment in their favor.

In considering the validity of this title, the first question for solution is, whether the premises were then open to selection by the State; for whether the eighth section of the act of 1841 be construed as conferring a grant *in præsenti*, operating to vest the title in the State upon the selection of the land pursuant to its directions, notwithstanding the words of grant used are in the future tense, — in that respect resembling the grant of the State of North Carolina to General Greene, which was the subject of consideration by this court in the case of *Rutherford* v. *Greene's Heirs*, reported in the 2d of Wheaton, — or whether the section be considered as giving only the promise of a grant, and therefore requiring further legislation, or further action in some form of the government, to vest the title of the land selected in the State, as held, or rather implied, by the decision in the case of *Foley* v. *Harrison*, reported in the 15th of Howard, the same result must follow if the land were not at the time open to selection. If not thus open, the whole proceeding on the part of McPherson and the governor of the State to appropriate the land was ineffectual for any purpose. That the land was not thus open, we think there is no doubt. The land was then claimed as part of the commons of Carondelet. The villages of St. Louis and Carondelet, on the acquisition of Louisiana in 1803 and for many years previously, claimed as commons certain lands adjoining their respective settlements. Those of St. Louis extended south of the village of that name, those of Carondelet to the north of its village; and a well-known line was generally recog-

nized as the boundary separating the commons of the two villages. That line commenced on the bank of the Mississippi at what is known as Sugar-loaf Mound, about four miles south of the settlement of St. Louis, and two miles north of that of Carondelet, and ran westerly to the common fields of Carondelet. It was contended, in the controversy which subsequently arose between the cities of St. Louis and Carondelet, that this line had been surveyed and marked by Soulard, a Spanish surveyor, previous to 1800, by order of the lieutenant-governor of the upper province of Louisiana. Be that as it may, it is clear that from the acquisition of the country until June 13, 1812, the land south of this line was claimed and used by the inhabitants of Carondelet as within their commons. On that day Congress passed an act confirming to the inhabitants of these villages their claims to their common lands. 2 Stat. 748. The act was a present operative grant of all the interest of the United States in the property used by the inhabitants of the villages as their commons; but it did not refer to the line mentioned, or designate any boundary of the commons, but left that to be established by proof of previous possession and use. The act at the same time made it the duty of the deputy-surveyor of the territory to survey the out-boundary lines of the villages so as to include the commons respectively belonging to them, and make out plats of the surveys, and transmit them to the surveyor-general, by whom copies were to be forwarded to the Commissioner of the General Land-Office and the recorder of land-titles. No survey appears to have been made, as here directed, of the out-boundary line of the village of Carondelet, until the year 1816; but its inhabitants claimed under the act the ownership and title of the land as part of their commons, up to the line mentioned on the north, as the same had been claimed and used by them previously. In 1816 or 1817, Elias Rector, a deputy-surveyor, under instructions from his superior, made a survey of the commons, running the upper line about a mile below the line alleged to have been established by Soulard. Some years afterwards (in 1834), another deputy-surveyor, by the name of Joseph C. Brown, was ordered by the surveyor-general to retrace and mark anew the lines of this survey, and connect

them with the surveys of adjoining public lands and private claims. This was accordingly done by him; and it would seem by various proceedings of the authorities of Carondelet that the survey thus retraced was at one time acquiesced in by them as a determination of the boundaries of their commons. They had a copy of it framed for the benefit of the town, and they introduced it in several suits with different parties as evidence of the extent of their claim. But at another time they denied the correctness of its northern line, which they insisted should be coincident with that alleged to have been run by Soulard. When St. Louis, in 1836, proceeded to subdivide her commons into lots down to the line of the survey, they gave notice, through a committee, that the lands below the alleged Soulard line were claimed as part of their commons; and, in 1855, Carondelet entered a suit against St. Louis for the possession of those lands. In the mean time, the matter remained undetermined in the land department at Washington until the 23d of February of that year. During this period, the Commissioner of the General Land-Office repeatedly informed the local land-officers that the tract was reserved from sale because it was claimed as part of the Carondelet commons, and on that ground their refusal to receive proofs of settlement from parties seeking to acquire a right of pre-emption was approved; and appropriate entries stating such reservation were made in the books of those officers. At one time (January, 1852) the Secretary of the Interior decided to have a new survey of the commons, and gave orders to that effect. The surveyor-general for Missouri having asked instructions as to the manner of the survey, and stating that, in his opinion, the new survey should include the land in controversy, the secretary then in office, the successor of the one who had ordered a new survey, re-examined the whole subject, and recalled the direction for a new survey made by his predecessor, and held that as the surveys of 1816 and 1834 had been executed by competent authority and approved, and were for years acquiesced in by the inhabitants of Carondelet, both they and the government of the United States were estopped and concluded by them; and that, in consequence, the survey of 1816, as retraced in 1834, should be sustained, excluding therefrom

a tract which had been reserved for a military post. This was the final determination of the boundaries of the Carondelet commons by that department of the government to which the supervision of surveys of public grants was intrusted. A few days before this determination was announced, the suit mentioned, of the city of Carondelet against the city of St. Louis, was commenced to obtain possession of. the lands below the Soulard line, over a portion of which the St. Louis commons had been extended. That suit was finally disposed of by the judgment of this court in March, 1862, affirming . that of the Supreme Court of the State, to the effect that both the government and Carondelet were concluded by the surveys stated.

The act of 1812 contemplated that the out-boundary line of the village would be surveyed so as to include the commons claimed, in accordance with the possession of the inhabitants previous to 1803, and not arbitrarily, according to the caprice of the surveyor; and any line run by him was subject, like all other surveys of public grants, to the supervision and approval of the land department at Washington. Until surveyed, and the survey was thus approved, the land claimed by Carondelet was, by force of the act requiring the survey and the establishment of the boundaries, necessarily reserved from sale. It was thus reserved to be appropriated in satisfaction of the claim, if that should be ultimately sustained. Whenever in the disposition of the public lands any action is required to be taken by an officer of the land department, all proceedings tending to defeat such action are impliedly inhibited. The allowance of selections by the States, or of pre-emptions by individuals, of lands which might be included within grants to . others, might interfere, and in many instances would interfere, with the accomplishment of the purposes of the government. A sale is as much prohibited by a law of Congress, when to allow it would defeat the object of that law, as though the inhibition were in direct terms declared. The general rule of the land department is, and from the commencement of the government has been, to hold as excluded from sale or pre-emption lands which might, in the execution of the laws of Congress, fall within grants to others; and therefore, in this case, until it was decided by the final determination of the Secretary of the Inte-

rior or of the Supreme Court of the United States whether the northern line of the commons was that run, as alleged, by Soulard previous to 1800, or that retraced by Brown in 1834, the land between those lines, embracing the premises in controversy, was legally reserved from sale, and, consequently, from any selection by the State as part of its five hundred thousand acres granted by the act of Sept. 4, 1841.

But there is another view of this case which is equally fatal to the claim of the plaintiffs. If the land outside of the survey as retraced by Brown in 1834 could be deemed public land, open to selection by the State of Missouri from the time the survey was returned to the land-office in St. Louis, it was equally open from that date to settlement, and consequent pre-emption by settlers. The same limitation which was imposed by law upon settlement was imposed by law upon the selection of the State. In either case the land must have been surveyed, and thus offered for sale or settlement. The party who takes the initiatory step in such cases, if followed up to patent, is deemed to have acquired the better right as against others to the premises. The patent which is afterwards issued relates back to the date of the initiatory act, and cuts off all intervening claimants. Thus the patent upon a State selection takes effect as of the time when the selection is made and reported to the land-office ; and the patent upon a pre-emption settlement takes effect from the time of the settlement as disclosed in the declaratory statement or proofs of the settler to the register of the local land-office. The action of the State and of the settler must, of course, in some way be brought officially to the notice of the officers of the government having in their custody the records and other evidences of title to the property of the United States before their respective claims to priority of right can be recognized. But it was not intended by the eighth section of the act of 1841, in authorizing the State to make selections of land, to interfere with the operation of the other provisions of that act regulating the system of settlement and pre-emption. The two modes of acquiring title to land from the United States were not in conflict with each other. Both were to have full operation, that one controlling in a particular case under which the first initiatory step was had.

Nor is there any thing in this view in conflict with the doctrines announced in *Frisbie* v. *Whitney*, 9 Wall. 187, and the *Yosemite Valley Case*, 15 id. 77. In those cases the court only decided that a party, by mere settlement upon the public lands, with the intention to obtain a title to the same under the pre-emption laws, did not thereby acquire such a vested interest in the premises as to deprive Congress of the power to dispose of the property; that, notwithstanding the settlement, Congress could reserve the lands for sale whenever they might be needed for public uses, as for arsenals, fortifications, light-houses, hospitals, custom-houses, court-houses, or other public purposes for which real property is required by the government; that the settlement, even when accompanied with an improvement of the property, did not confer upon the settler any right in the land as *against the United States*, or impair in any respect the power of Congress to dispose of the land in any way it might deem proper; that the power of regulation and disposition conferred upon Congress by the Constitution only ceased when all the preliminary acts prescribed by law for the acquisition of the title, including the payment of the price of the land, had been performed by the settler. When these prerequisites were complied with, the settler for the first time acquired a vested interest in the premises, of which he could not be subsequently deprived. He was then entitled to a certificate of entry from the local land-officers, and ultimately to a patent of the United States. Until such payment and entry, the acts of Congress gave to the settler only a privilege of pre-emption in case the lands were offered for sale in the usual manner; that is, the privilege to purchase them in that event in preference to others.

But whilst, according to these decisions, no vested right as *against the United States* is acquired until all the prerequisites for the acquisition of the title have been complied with, parties may, as against each other, acquire a right to be preferred in the purchase or other acquisition of the land, when the United States have determined to sell or donate the property. In all such cases, the first in time in the commencement of proceedings for the acquisition of the title, when the same are regularly followed up, is deemed to be the first in right. So in this case, Chartrand, the ancestor, by his previous settlement in 1835

upon the premises in controversy, and residence with his family, and application to prove his settlement and enter the land, obtained a better right to the premises, under the law then existing, than that acquired by McPherson by his subsequent State selection in 1849. His right thus initiated could not be prejudiced by the refusal of the local officers to receive his proofs upon the declaration that the land was then reserved, if, in point of fact, the reservation had then ceased. The reservation was asserted, as already mentioned, on the ground that the land was then claimed as a part of the commons of Carondelet. So soon as the claim was held to be invalid to this extent by the decision of this court in March, 1862, the heirs of Chartrand presented anew their claim to pre-emption, founded upon the settlement of their ancestor. The act of Congress of March 3, 1853, 10 Stat. 244, provided that any settler who had settled or might thereafter settle on lands previously reserved on account of claims under French, Spanish, or *other grants*, which had been or should thereafter be declared invalid by the Supreme Court of the United States, should be entitled to all the rights of preemption granted by the act of Sept. 4, 1841, after the lands were released from reservation, in the same manner as if no reservation had existed. With the decision declaring the invalidity of the claim to the land in controversy, all obstacles previously interposed to the presentation of the claim of the heirs of Chartrand, and the proofs to establish it, were removed. According to the decisions in *Frisbie* v. *Whitney* and the *Yosemite Valley Case*, Congress might then have withdrawn the land from settlement and pre-emption, and granted it directly to the State of Missouri, or reserved it from sale for public purposes, and no vested right in Chartrand or his heirs as against the United States would have been invaded by its action; but, having allowed by its subsisting legislation the acquisition of a right of preference as against others to the earliest settler or his heirs, the way was free to the prosecution of the claim of the heirs.

If the matter were open for our consideration, we might perhaps doubt as to the sufficiency of the proofs presented by the heirs of Chartrand to the officers of the land department to establish a right of pre-emption by virtue of the settlement and

proceedings of their ancestor, or by virtue of their own settlement. Those proofs were, however, considered sufficient by the register of the local land-office, by the Commissioner of the General Land-Office on appeal from the register, and by the Secretary of the Interior on appeal from the commissioner. There is no evidence of any fraud or imposition practised upon them, or that they erred in the construction of any law applicable to the case. It is only contended that they erred in their deductions from the proofs presented; and for errors of that kind, where the parties interested had notice of the proceedings before the land department, and were permitted to contest the same, as in the present case, the courts can furnish no remedy. The officers of the land department are specially designated by law to receive, consider, and pass upon proofs presented with respect to settlements upon the public lands, with a view to secure rights of pre-emption. If they err in the construction of the law applicable to any case, or if fraud is practised upon them, or they themselves are chargeable with fraudulent practices, their rulings may be reviewed and annulled by the courts when a controversy arises between private parties founded upon their decisions; but, for mere errors of judgment upon the weight of evidence in a contested case before them, the only remedy is by appeal from one officer to another of the department, and perhaps, under special circumstances, to the President. It may also be, and probably is, true that the courts may furnish, in proper cases, relief to a party where new evidence is discovered, which, if possessed and presented at the time, would have changed the action of the land-officers; but, except in such cases, the ruling of the department on disputed questions of fact made in a contested case must be taken, when that ruling is collaterally assailed, as conclusive.

In this case, therefore, we cannot inquire into the correctness of the ruling of the land department upon the evidence presented of the settlement of Chartrand, the ancestor, or of his heirs. It follows that the patent issued by the United States, taking effect as of the date of such settlement, overrides the patent of the State of Missouri to McPherson, even admitting, that, but for the settlement, the land would have been open to selection by the State.                    *Decree affirmed.*