Ethel **AGUILAR, Elmer Hotch, Ester Hotch, Donald Hotch, Smith J. Katzeek, Sr., Larry Jacquot and Henry Jacquot, Individually and on behalf of all others similarly situated, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. A76–271 Civil.**

United States District Court, D. Alaska.

July 31, 1979.

Luther A. Granquist, Gregory M. O'Leary, Alaska Legal Services Corp., Anchorage, Alaska, for plaintiffs.

Stephen Cooper, Asst. U. S. Atty., Fairbanks, Alaska, Alexander O. Bryner, U. S. Atty., Anchorage, Alaska, for defendants.

Barbara J. Miracle, Asst. Atty. Gen., Anchorage, Alaska, for State of Alaska amicus curiae.

MEMORANDUM AND ORDER

VON DER HEYDT, Chief Judge.

THIS CAUSE comes before the court on plaintiffs' motion for partial summary

judgment and for a remand to the Department of Interior, defendant's motion for summary judgment and for an order vacating the class certification.

The plaintiffs in this case are Alaskan Natives who have made timely applications to the U.S. Department of Interior for an allotment under the Alaska Native Allotment Act (May 17, 1906, 34 Stat. 197, as amended Aug. 2, 1956, Ch. 891, 70 Stat. 954; former 43 ·U.S.C. §§ 270–1–270–3, repealed but with a savings clause for applications pending on December 18, 1971, by P.L. 92–203, 85 Stat. 70). In *Ethel Aguilar*, 15 IBLA 30 (1974), the Interior Board of Land Appeals affirmed the rejection of their allotment applications without a hearing because the land they claim for the allotment has already been conveyed to the State of Alaska. The plaintiffs claim that the use and occupancy upon which their allotments applications are based commenced prior to the conveyance of the land to the State of Alaska.

The court has previously certified a class under Fed.R.Civ.P. 23(a) and (b)(2) as follows:

All Alaska Native allotment applicants each of whom commenced use of the land for which he or she applied prior to the filing with the Department of Interior of an application for conveyance of the same land to the State of Alaska and whose allotment application was or will be rejected, in whole or part, because the land described therein was conveyed to the State of Alaska prior to adjudication of the allotment application.

The defendant has moved to vacate this class but the court finds no merit in the grounds cited by defendant. Oral argument has been requested but in view of the extensive briefs and in order to expedite the business of the court oral argument is denied. Local Rule 5(C)(1). In order to decide these motions the court must determine what kind of interest an Alaskan Native Allotment applicant has in his claim that he uses and occupies, and what the responsibility of the federal government is to protect that interest.

## I. The Interest of the Allotment Claimants in the Land Conveyed to the State

The Alaska Native Allotment Act of 1906 was the first statute passed which allowed the Natives of Alaska to perfect their title to the land occupied and used by them. *United States v. Atlantic Richfield Co.*, 435 F.Supp. 1009, 1015 (D. Alaska 1977). The Committee on Public Lands described to the House of Representatives how the land used and occupied by Alaskan Natives could be selected by others and cause them to be dispossessed because no legal means existed to secure their rights:

The necessity for this legislation arises from the fact that Indians in Alaska are not confined to reservations as they are in the several States and Territories of the United States, but they live in villages and small settlements along the streams where they have their little homes upon land to which they have no title, nor can they obtain title under existing laws. It does not signify that because an Alaska Indian has lived for many years in the same hut and reared a family there that he is to continue in peaceable possession of what he has always regarded his home. Some one who regards that particular spot as a desirable location for a home can file upon it for a homestead, and the Indian or Eskimo, as the case may be, is forced to move and give way to his white brother.

H.R.Rep.No.3295, 59th Cong., 1st Sess. (1906). In order to remedy this problem the Congress passed the Alaska Native Allotment Act which

authorized the Secretary "in his discretion and under such rules as he may prescribe" (§ 270–1) to allot up to 160 acres of vacant, unappropriated, and unreserved land in Alaska to any qualified Alaska Native. To qualify, the Native applicant must make "proof satisfactory to the Secretary . . . of substantially continuous use and occupancy of the land for a period of five years." (§ 270–3) The Secretary's regulations construe the Act to allow for customary and seasonal patterns of use and occupan-

cy, but require that there must be actual possession and use, potentially exclusive of others, and not merely intermittent use. 43 C.F.R. § 2561.0–5(a). Thus, an applicant can meet the required qualifications by showing seasonal use of the claimed land, potentially exclusive of others, for five consecutive years for such customary purposes as hunting, fishing, or berry picking. *Pence v. Kleppe*, 529 F.2d 135, 137 (9th Cir. 1976). The Allotment Act states "Any person qualified for an allotment as aforesaid shall have the *preference right to secure by allotment the nonmineral land occupied by him* not exceeding one hundred and sixty acres. (emphasis added). 34 Stat. 197, (former 43 U.S.C. § 270–1).

The Ninth Circuit Court of Appeals interpreted the legislative history of the Act to mean "that the Native applicants here have a sufficient property interest to warrant due process protection . . . This is a clear indication that Congress intended to create or to recognize rights in Alaska Natives to the land that they occupy for the statutory period, and not, as the Secretary contends, merely a hope that the government will give them the land." *Pence v. Kleppe*, 529 F.2d at 141–42.

■ The plaintiffs contend that their use and occupancy prior to the state selections reserved the land from selection by the state, and therefore that the United States had no authority to convey the lands claimed by the Native allotment applicants to the State. This court finds that the "preference right" granted by the Native Allotment Act, the relevant case law, and the decisions of the Department of Interior support the claims of the plaintiffs.

■■ Until the passage of the Alaska Native Claims Settlement Act, land occupied by Natives was not available for state selection. *State of Alaska v. Udall*, 420 F.2d 938 (9th Cir. 1969), *cert. denied* 397 U.S. 1076, 90 S.Ct. 1522, 25 L.Ed.2d 811 (1970). But these plaintiffs need not rely on a naked aboriginal title. The Native Allotment Act grants to qualified applicants a preference right to the allotment of land occupied by such applicants. *Herbert H. Hilscher*, 67 I.D. 410 (1960). "Conveyance of land in derogation of a Congressional directive to respect and protect Native occupancy would be void and legally ineffective to extinguish aboriginal title." *United States v. Atlantic Richfield Co.*, 435 F.Supp. 1009 at 1020 n. 45.

In *Cramer v. United States*, 261 U.S. 219, 43 S.Ct. 342, 67 L.Ed. 622 (1923), the United States on behalf of three Indians in California brought suit to cancel a portion of a patent issued by the United States to the Central Pacific Railway Company because that land was occupied and used by the Indians and therefore could not validly be conveyed to the railroad. The Court held that the Indians' pre-existing right of possession excepted the lands occupied by the Indians from the grant to the railroad. The discussion of the government policy involved and the Interior Department cases upholding it is very instructive in the instant case and will be quoted at length:

Unquestionably it has been the policy of the Federal Government from the beginning to respect the Indian right of occupancy, which could only be interfered with or determined by the United States. *Beecher v. Wetherby*, 95 U.S. 517, 525 [24 L.Ed. 440]; *Minnesota v. Hitchcock*, 185 U.S. 373, 385 [, 22 S.Ct. 650, 46 L.Ed. 954]. It is true that this policy has had in view the original nomadic tribal occupancy, but it is likewise true that in its essential spirit it applies to individual Indian occupancy as well; and the reasons for maintaining it in the latter case would seem to be no less cogent, since such occupancy being of a fixed character lends support to another well understood policy, namely, that of inducing the Indian to forsake his wandering habits and adopt those of civilized life. That such individual occupancy is entitled to protection finds strong support in various rulings of the Interior Department, to which in land matters this Court has always given much weight. *Midway Co. v. Eaton*, 183 U.S. 602, 609 [22 S.Ct. 261, 46 L.Ed. 347]; *Hastings & Dakota R. R. Co. v. Whitney*,

132 U.S. 357, 366 [, 10 S.Ct. 112, 33 L.Ed. 363]. That department has exercised its authority by issuing instructions from time to time to its local officers to protect the holdings of non-reservation Indians against the efforts of white men to dispossess them. See 3 L.D. 371; 6 L.D. 341; 32 L.D. 382. In *Poisal v. Fitzgerald*, 15 L.D. 19, the right of occupancy of an individual Indian was upheld as against an attempted homestead entry by a white man. In *State of Wisconsin*, 19 L.D. 518, there had been granted to the State certain swamp lands within an Indian reservation, but the right of Indian occupancy was upheld, although the grant in terms was not subject thereto. In *Ma-Gee-See v. Johnson*, 30 L.D. 125, Johnson had made an entry under § 2289, Rev.Stats., which applied to "unappropriated public lands." It appeared that at the time of the entry and for some time thereafter the land had been in the possession and use of the plaintiff, an Indian. It was held that under the circumstances the land was not unappropriated within the meaning of the statute, and therefore not open to entry. In *Schumacher v. State of Washington*, 33 L.D. 454, 456, certain lands claimed by the State under a school grant, were occupied and had been been improved by an Indian living apart from his tribe, but application for allotment had not been made until after the State had sold the land. It was held that the grant to the State did not attach under the provision excepting lands "otherwise disposed of by or under authority of an act of Congress." Secretary Hitchcock, in deciding the case, said:

"It is true that the Indian did not give notice of his intention to apply for an allotment of this land until after the State had made disposal thereof, but the purchaser at such sale was bound to take notice of the actual possession of the lands by the Indian if, as alleged, he was openly and notoriously in possession thereof at and prior to the alleged sale, and that the act did not limit the time within which application for allotment should be made."

Congress itself, in apparent recognition of possible individual Indian possession, has in several of the state enabling acts required the incoming State to disclaim all right and title to lands "owned or *held by any Indian or* Indian tribes." See 25 Stat. 676, c. 180, § 4, par. 2; 28 Stat. 107, c. 138, § 3, par. 2.

The action of these individual Indians in abandoning their nomadic habits and attaching themselves to a definite locality, reclaiming, cultivating and improving the soil and establishing fixed homes thereon was in harmony with the well understood desire of the Government which we have mentioned: To hold that by so doing they acquired no possessory rights to which the Government would accord protection, would be contrary to the whole spirit of the traditional American policy toward these dependent wards of the nation.

*Cramer v. United States*, 261 U.S. at 227–29, 43 S.Ct. at 344. While some of the language in this decision is unfortunately paternalistic, the legal principles announced in *Cramer* would appear to have even more force when applied to a right of occupancy protected by the Native Allotment Act of 1906. No statute or treaty protected the right of occupancy litigated in *Cramer* while the right of occupancy of these plaintiffs is explicitly given a preference under the Native Allotment Act. *See also Minnesota v. Hitchcock*, 185 U.S. 373, 388–92, 22 S.Ct. 650, 46 L.Ed. 954 (1902) (a grant to Minnesota from the United States was held not to include Indian land protected by treaty but not formally set aside as an Indian reservation). *Leavenworth, Lawrence and Galveston Railroad v. United States*, 92 U.S. 733, 23 L.Ed. 634 (1876) (a grant to Kansas from the United States for the purpose of building a railroad was held not to include Indian land protected by treaty stipulations). While the two cases just cited involved Indian lands protected by treaty, there is no apparent reason why less protection should be given to lands of Native Alaskans that are protected by a statute such as the Allotment Act.

■ The fact that these Natives did not file an application for an allotment until after the land was selected by the State does not eliminate the protection given their right of use and occupancy. The departmental decisions and rules regarding allotment rights are in some respects similar to those governing settlement and homestead. *Herbert H. Hilscher*, 67 I.D. at 414. The preference right granted Alaskan Natives under the allotment act is very similar to the right of preemption frequently granted white settlers who occupied public lands on the American frontier before the lands were surveyed and therefore were not available for sale. The right of preemption gave the settlers first chance to purchase the land. *Shepley v. Cowan*, 91 U.S. 330, 23 L.Ed. 424 (1875) involved a dispute between state selection rights and a settler's pre-emption rights. The plaintiff based his claim on a patent received from the State of Missouri and the defendant based his claim on a patent issued by the United States to a settler claiming pre-emption rights. The Court noted that as against each other (in the instant case the right of Alaska as against the allotment applicants), "the first in time in the commencement of proceedings for the acquisition of the title, when the same are regularly followed up, is deemed to be first in right." *Shepley v. Cowan*, 91 U.S. at 338. But the Court earlier in its opinion had held that the first initiatory act for a pre-emption settlement takes effect at settlement. "Thus the patent upon a State selection takes effect as of the time *when the selection is made* and reported to the land-office; and the patent upon a pre-emption settlement takes effect *from the time of the settlement* as disclosed in the declaratory statement or proofs of the settler to the register of the local land-office." *Shepley v. Cowan*, 91 U.S. at 337 (emphasis added). The Court held that the patent based upon the pre-emption right was superior. In much the same way the preference right of the Alaskan Natives in this case was acquired upon their first use and occupancy of the land. *See also Stockley v. United States*, 260 U.S. 532, 544, 43 S.Ct. 186, 189,

67 L.Ed. 390 (1923) (A homestead claim that was not yet patented was held a valid existing right excepted from a Presidential withdrawal order because, "[t]he effect of a preliminary homestead entry is to confer upon the entryman an exclusive right of possession, which continues so long as the entryman complies in good faith with the requirements of the homestead law.")

Two departmental decisions also support the position of the plaintiffs in this case. In *Yakutat and Southern Railway v. Setuck Harry, Heir of Setuck Jim*, 48 I.D. 362 (1921) it was held that actual occupancy and use of a tract of land by an Alaskan Native prior to its inclusion in the Tongass National Forest confers upon the occupant a preference right to a Native Allotment, although the application for the allotment was filed subsequent to the proclamation creating the National Forest. In a more recent decision of the Interior Board of Land Appeals it was held that the use and occupancy of an allotment applicant would preclude State selection under the Statehood Act even though the application for the allotment was filed after the tentative approval of the State selection. *Lucy S. Ahvakana*, 3 IBLA 342 (1971). The foregoing cases convince this court that the plaintiffs are correct in their contention that land in an allotment claim used and occupied for subsistence purposes by an Alaskan Native was not available for conveyance to the State of Alaska.

■ The State of Alaska as *amicus* has argued that the contention of the plaintiffs is foreclosed by this court's decision in *United States v. Atlantic Richfield Co.*, 435 F.Supp. 1009 (D. Alaska 1977) which held that § 4(a) of the Alaska Native Claims Settlement Act, 43 U.S.C. § 1603(a), extinguished all claims based upon aboriginal title at conveyance or tentative approval of conveyance to the State of Alaska. None of the principles announced in this decision disturb that decision because the claims of the plaintiffs are not based upon aboriginal title but are based on the first preference given these Natives by the Allotment Act passed in 1906. Rather than extinguishing

the claims of plaintiffs, ANCSA repealed the Allotment Act but provided "any application for an allotment that is pending before the Department of the Interior on December 18, 1971, may, at the option of the Native applicant, be approved . . .", § 18(a), U.S.C. § 1617(a). Acceptance of the State's argument would mean that what the Congress saved in § 18(a) it had already extinguished by § 4. It would create the anomalous situation where Natives who happened to use and occupy land conveyed to the State had their allotment rights taken away, while Natives living on federal land had their allotment preserved. The State or the defendants have referred to no part of the legislative history of ANCSA that would support such an act of discrimination on the part of the Congress. At most the potential conflict between § 4 and § 18(a) creates an ambiguity in ANCSA that must be resolved in favor of the Natives. *Alaska Pacific Fisheries v. United States*, 248 U.S. 78, 89, 39 S.Ct. 40, 63 L.Ed. 138 (1918), *Bryan v. Itasca Co.*, 426 U.S. 373, 392–93, 96 S.Ct. 2102, 38 L.Ed.2d 710 (1976); *Alaska Public Easement Defense Fund v. Andrus*, 435 F.Supp. 664, 671 (D. Alaska 1977).

The claims of these plaintiffs are in no way comparable to the amorphous trespass claims asserted in the *ARCO* case. No applicant for a Native allotment can receive more than 160 acres and no Native who does not already have an application pending before the Department of Interior as of December 18, 1971, could benefit from this decision.

II. The Federal Government's Responsibility to Recover Lands Wrongfully Conveyed to the State

The defendant has refused to adjudicate the plaintiffs' applications so that it can determine the validity of their allotment claims. The Department of Interior only made an informal investigation and determined that the conveyances to the State were valid. The existence or sufficiency of the plaintiffs' use and occupancy cannot be determined on a motion for summary judgment. But the rights of the plaintiffs likewise cannot be determined without a formal adjudication under *Pence v. Kleppe*, 529 F.2d 135, 137 (9th Cir. 1976).

■ In its relationship with Native Americans the government owes a special duty analogous to those of a trustee. *Heckman v. United States*, 224 U.S. 413, 32 S.Ct. 424, 56 L.Ed. 820 (1912); *Seminole Nation v. United States*, 316 U.S. 286, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942); *Morton v. Ruiz*, 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974). These "exacting fiduciary standards" apply to the federal government in its conduct toward Alaskan Natives. *Alaska Pacific Fisheries v. United States*, 249 U.S. 53, 39 S.Ct. 208, 63 L.Ed. 474 (1918); *Aleut Community of St. Paul Island v. United States*, 480 F.2d 831, 202 Ct.Cl. 182 (1973); *Adams v. Vance*, 187 U.S.App.D.C. 41, 44 n. 3, 570 F.2d 950, 953 n. 3 (1978); *People of Togiak v. United States*, 470 F.Supp. 423 (D.D.C.1979); *Eric v. Secretary of HUD*, 464 F.Supp. 44 (D. Alaska 1978).

■ In the previous section of this opinion the court has identified the statutorily protected interests which the plaintiffs have in the land which they use and occupy. The "preference right" gives qualified applicants first choice in the land included in a pending application. If through an adjudication the plaintiffs can establish the facts which they allege which would establish their right to an allotment, they would have an equitable interest in their allotment. The protection of Indian property rights is an area where the trust responsibility has its greatest force. *Seminole Nation v. United States*, 316 U.S. 286, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942), *Pyramid Lake Paiute Tribe of Indians v. Morton*, 354 F.Supp. 252 (D.D.C.1953). While the government in this litigation has not denied its trust responsibility, it evidently takes the position that it no longer has to act because it has already given away the land claimed by the plaintiffs. But this is clearly circular reasoning.

The Department of Interior refuses to hold adjudicatory hearings which the plaintiffs contend would establish that the United States wrongfully or mistakenly conveyed the disputed allotments to the State

of Alaska. The Department has contended that it has no responsibility to recover the lands because there was no mistake in the conveyance. But it then refuses to hold hearings required by *Pence v. Kleppe* that would determine whether a mistake was made on the ground that it no longer has jurisdiction since the land has already been conveyed to the state.

This court agrees with Administrative Law Judge Burski who dissented in a recent decision of the Interior Board of Land Appeals dealing with the same issue. He said:

> Moreover, under the decisions of the Ninth Circuit Court of Appeals in *Pence v. Kleppe*, 592 F.2d 135 (1976), and this Board in *Donald Peters*, 26 IBLA 235 (1976), no Native allotment application can be rejected on the basis of a disputed issue of fact without notice and an opportunity for hearing. It is true that where a decision to reject a Native allotment is premised on a purely legal determinant no hearing is required. But I must admit difficulty in following the logic of a procedure which rejects an allotment application on the basis of an issued patent where the correctness of the issuance of the patent is disputed, without ever affording the Native allotment applicant an opportunity to show his entitlement.

> If this Department has erroneously issued the patent to the State in derogation of the appellant's rights, it seems only elementary justice that the Department should bear the economic burdens attendant to a suit to cancel the patent. A hearing is essential before the Department can make an informed judgment as to the merits of the appellant's application. Accordingly, I would reverse the decision below rejecting the Native allotment application, order the State Office to hold further action on the application in abeyance and direct the State of Alaska to bring a contest against the allotment applicant. Should the State of Alaska decline, I would recommend that the Solicitor's Office undertake discussions with the Justice Department with a view towards the initiation of suit to cancel [the patents], to the extent of the conflict between the patents and the allotment application.

*Berthyn Jane Baker*, 41 IBLA 239 (1979) (Judge Burski dissenting).

 The defendant's decision not to recover the land without first holding a hearing to determine the facts is arbitrary and capricious. The defendant's rejection of the plaintiffs' allotment applications without a fact-finding hearing is a violation of the plaintiffs' rights to due process under *Pence*. If the defendant has mistakenly or wrongfully conveyed land to the State of Alaska to which plaintiffs have a superior claim, it is the responsibility of the defendant to recover that land. *United States v. Cramer*, 261 U.S. 219, 43 S.Ct. 342, 67 L.Ed. 622 (1923); *Heckman v. United States*, 224 U.S. 413, 32 S.Ct. 424, 56 L.Ed. 820 (1912); *Joint Tribal Council of Passamaquoddy Tribe v. Morton*, 528 F.2d 370 (1st Cir. 1975).

Accordingly IT IS ORDERED:

1. THAT defendant's motion to vacate class certification is denied.

2. THAT defendant's motion for summary judgment is denied.

3. THAT plaintiffs' motion for partial summary judgment and remand to the Department of Interior is granted.

4. THAT the plaintiffs' cases are remanded to the Department of Interior with instructions to adjudicate their substantive claims of entitlement pursuant to all applicable procedures.

5. THAT the Clerk may prepare an appropriate final judgment form.