**STATE OF ALASKA, Plaintiff,**

v.

**13.90 ACRES OF LAND, et al., Defendants.**

**ALYESKA PIPELINE SERVICE COMPANY, as agent for the owners of the Trans-Alaska Pipeline System, et al., Plaintiffs,**

v.

**Esther John ETALOOK, et al., Defendants.**

**Esther John ETALOOK, Plaintiff,**

v.

**EXXON PIPELINE COMPANY, et al., Defendants,**

**and**

**The United States of America, et al., Unclassified Parties.**

**Nos. F81–040 CIV, F81–050 CIV and F83–037 CIV.**

United States District Court, D. Alaska.

Dec. 23, 1985.

Thomas E. Meacham, Burr, Pease & Kurtz, Anchorage, Alaska, for plaintiff.

Clem H. Stephenson, Tulsa, Okl., Stephen Cooper, Asst. U.S. Atty., Fairbanks, Alaska, for defendants.

### MEMORANDUM AND ORDER

VON DER HEYDT, District Judge.

THIS CAUSE comes before the court on Alyeska's motion to quiet title and dismiss, Alyeska's motion for a protective order, and Esther John Etalook's motion to compel deposit of additional funds. Although all parties are familiar with the record, the court finds that a review of the facts supported by the record will assist it in deciding the above motions.

### I. *Factual Background*

Arctic John Etalook began to occupy the native allotment at issue in this action in July 1946. *See* Ex. 3, Docket # 88, F83–037. This use apparently was for at least five years' duration and continuous prior to 1969. On July 20, 1971 Arctic John applied for a native allotment pursuant to the Alaska Native Allotment Act of 1906, Act of May 17, 1906, ch. 2469, 34 Stat. 197 (formerly codified at 43 U.S.C. § 270–1; repealed 1971). BLM received the application April 14, 1972. The allotment appears to have been recorded correctly on BLM's Master Title Plats on or before April 13, 1972. *See* Interrogatory No. 3, attached to Docket # 95, F83–037. *But see* Sullivan deposition at 22, 24–25, Docket # 80, F83–037 (stating that Etalook allotment was originally misplatted). The allotment was issued August 27, 1975 and transmitted by BLM to the BIA. The BIA recorded the allotment certificate for Arctic John and then sent him the recorded Certificate of Allotment on October 29, 1975. *See* Exs. 7–10, Docket # 91, F83–037.

At the same time the above events were occurring, Alyeska was attempting to secure rights of way across the lands occupied by Etalook for the Trans-Alaska oil pipeline. Alyeska first filed right-of-way applications for the pipeline right of way with the BLM in 1969. The Trans-Alaska Pipeline Authorization Act, 43 U.S.C. § 1651 *et seq.* (1982), authorizing construction of the pipeline, was enacted in 1973. Alyeska's right-of-way application was granted in 1974. The haul road was built across Arctic John's allotment in 1974, and the pipeline in 1975, although initial land clearing for the pipeline probably occurred in 1974.

Alyeska first became aware of the conflict between the right of way and Arctic John's allotment application late in 1974 when John Heffle notified Frank Moolin, construction superintendent for Alyeska, that trespass was occurring. Sullivan deposition at 23. An initial meeting regarding options to resolve the conflict between Arctic John and Alyeska occurred April 8, 1975. *See* Ex. 4, Docket # 80, F80–037. A second meeting was held May 27, 1975. At this meeting Arctic John accepted $25,000 in return for granting Alyeska a Road Right of Way containing 13.9 acres and a Pipeline Right of Way containing 11.1 acres.[1] On the same day, the BIA sent a letter to Alyeska's attorney, Harris Saxon, stating

> These [Arctic John's] lands are segregated from public domain by applications filed pursuant to the Act of May 17, 1906, (34 Stat. 197), as amended August 2, 1956 (70 Stat. 954; 48 U.S.C. 357). When title to the lands passes to the individual Native applicant, jurisdiction of the land will be under the Bureau of Indian Affairs. At that time, all easements for right of way and construction permits across individual restricted Native lands must be processed and approved by Secretary of the Interior in accordance with Code of Federal Regulations Title 25-Part 161. We have no objection at this time to the agreements you submitted. However, this non-objection does not imply approval now and is not to be construed as any intent for approval in the future.

Ex.D, Docket # 109, F81–050. This letter reiterates the information explained to Alyeska's representatives at that time by Joe Donahue, then a Realty Officer for the BIA. *Donahue aff.*, ¶¶ 7–10, Docket # 104, F81–050.

After this agreement was signed Mr. Sullivan[2] became aware that Alyeska intended to place a valve site on Mr. Etalook's property. He informed the Alyeska pipeline project management team that it either had to acquire an additional right of way or move the valve. Despite this warning, and a promise to Mr. Sullivan that the valve would be moved, Alyeska in fact placed it on the allotment. Sullivan deposition, Ex. 1, Docket # 80, F83–037. Alyeska opened negotiations for compensation for the additional property taken in August, 1976. After an exchange of letters, a meeting was held February 16, 1977. At this meeting Arctic John accepted $3,500 in return for signing a grant of .25 acres additional pipeline right of way. *See, e.g.*, Ex. 6. Docket # 80, F83–037 (Sub-exhibits 1–3).

In Alyeska's letter of February 11, 1977 (the Feb. 16 agreement), it requested that Arctic John "have the appropriate Bureau of Indian Affiars official review, approve and execute the enclosed copy of this letter." The letter was "read and approved" by Katherine L. Adams, BIA Realty Specialist, on February 16, 1977.[3] Paragraph 6 of this agreement reads as follows:

> Alyeska shall not use or interfere with your native allotment (USS 5199) except for the purposes and to the extent provided in that certain Road Right of Way Agreement dated May 27, 1975; and that certain Right of Way Agreement dated May 27, 1975; and the above-described Amended Right of Way agreement.

After this agreement was signed Arctic John soured to the idea of his land being used for the pipeline and haul road. On January 20, 1978, he wrote a letter indicating he did not intend to grant any further easements beyond those already entered into with Alyeska. *See* Donahue cronology, Ex. 4, Docket # 80, F83–037; Ex. 17,

---

**1.** This court held in its August 23, 1983 Order that Arctic John did not have an alienable interest in the land prior to issue of patent.

**2.** Mr. Sullivan is President of Land Field Services Inc., a land acquisition firm used by Alyeska to acquire pipeline rights of way and perform other "land" work.

**3.** If one assumes that this signature was intended to be official BIA approval of the transaction, the approval is invalid for the reason that only the BIA Area Director in Juneau is authorized to grant the appropriate approval. *See* Donahue Aff., ¶ 14, Docket # 104, F81–050.

Docket # 91, F83–037. Another meeting regarding the Arctic John allotment was held October 12, 1978, although what instigated this meeting is not clear to the court. *See* Donahue chronology. In any event, on November 14, 1978, the BIA wrote both Alyeska and the State informing them that neither had an approved grant of easement over Arctic John's property. On November 21, 1978, Alyeska for the first time formally submitted an application for a right of way over the allotment. This application eventually was refused for the reason that Arctic John withdrew his consent for the pipeline and road easements. This refusal was based on Arctic John's apparent belief that the tenure of the easement agreements had been fraudulently misrepresented to him. *See* Ex. V, X, Docket # 31, F81–040.

## II. *Priority of Claims*

■ Alyeska's first argument is that their right-of-way application, filed in 1969 (F–12505), has priority over Arctic John's native allotment application filed with the BIA in 1971 (F–18270). This argument is without merit. It is true that completion of five years' use and occupancy does not vest a preference right in the native occupant. The use and occupancy creates an inchoate preference right. This inchoate preference right only becomes vested upon the filing of a timely application. *See, e.g., Golden Valley Electric Ass'n*, 85 IBLA 363, 364 (1985); *United States v. Flynn*, 53 IBLA 208, 234 (1981). Once vested, the preference relates back to the initiation of occupancy and takes preference over competing applications filed prior to the native allotment application. *Aguilar v. United States*, 474 F.Supp. 840 (D.Alaska 1979);

*Flynn*, 53 IBLA at 235. *See also Village and City Council of Aleknagik*, 77 IBLA 130, 135 (1983) (holding implicitly that application relates back).

The *Golden Valley Electric Ass'n* case cited by Alyeska is distinguishable. In that case the allotment applicant had neither completed five years of use and occupancy, creating an inchoate preference right, nor filed an allotment application prior to the issue of the grant of the transmission line right of way.[4] Further, contrary to Alyeska's contention, the rule in *Aguilar, supra*, is not limited to Statehood Act land selection claims.

■ Alyeska further argues that its 1969 pipeline application, in conjunction with P.L.O. 4760 (35 Fed.Reg. 424, Jan. 13, 1970)[5] served to segregate the federal lands that later became the pipeline and road right of way, and thereby barred consideration of Arctic John's July 20, 1971 allotment application.[6] This argument is fundamentally misconceived. Segregation of lands, as opposed to withdrawal, bars subsequent *entry* by others. The cases cited by Alyeska do not address the situation present here, an application subsequent to segregation based on occupancy and entry prior to segregation. *See generally McMichael v. Murphy*, 197 U.S. 304, 25 S.Ct. 460, 49 L.Ed. 766 (1905); *United States v. Central Illinois Public Service Co.*, 365 F.2d 121 (7th Cir.1966). To the contrary, it is well established that where a native has met the five-year substantial use and occupancy requirements prior to segregation, a subsequent segregation or reservation of those lands will not defeat an allotment application. *Floyd L. Anderson,*

---

4. The court does not address whether *Golden Valley Electric Ass'n* is correctly decided. It finds solely that its reasoning does not apply to the present case.

5. P.L.O. 4760 did not withdraw the lands in question from non-pipeline entry. *Cf.* P.L.O. 5150, 36 Fed.Reg. 25410 (Dec. 31, 1971) (doing so). It merely amended P.L.O. 4582, which withdrew all public lands from entry, to allow Alyeska (or its predecessor) to file and receive a pipeline right of way.

6. July 20, 1971 is the date the application was submitted to the BIA. *See State of Alaska v. Juneau Area Acting Director, Bureau of Indian Affairs, and Arctic John Etalook*, 91 IBIA 126, 128 (1981); Exhibit B, Docket # 114, F81–050); Ex. 3, Docket # 88, F83–037. Apparently, prior to April 14, 1972, the BIA reviewed the application to determine whether certification pursuant to 43 C.F.R. § 2561.1(d) (1981) was proper. The BLM received the certified application from BIA on April 14, 1972. *See* Ex. B, Docket # 114, F81–050.

*Sr.,* 41 IBLA 280, 282 (1979); *Arthur R. Martin,* 41 IBLA 224, 226 (1979); *Herman Joseph (on reconsideration),* 22 IBLA 266, 267 (1975).

Alyeska then argues that so long as a native's rights under the Allotment Act are inchoate (i.e., prior to application and vesting of rights) Congress, or an executive agency with Congressional authority, can withdraw the lands from entry and rededicate them to another use. This is generally correct. *See, e.g., Russian-American Packing Co. v. United States,* 199 U.S. 570, 577–78, 26 S.Ct. 157, 158–59, 50 L.Ed. 314 (1905); *Alaska Miners v. Andrus,* 662 F.2d 577, 580 (9th Cir.1981). The argument is unavailing, however, for the reason that there was no appropriate rededication of the right of way prior to the vesting of Arctic John's rights in July, 1971.[7]

Alyeska relies first on the relation-back doctrine to argue that the 1974 patent related-back to the 1969 application. This argument doesn't work for the reasons stated above, i.e., that segregation did not bar the filing of Arctic John's application. The 1974 conveyance accordingly did not rededicate the lands because it did not effectively extinguish Arctic John's vested right to the entire allotment. *See* Memorandum and Order of August 23, 1983 at 6–7. Therefore, since the 1974 patent did not extinguish Arctic John's rights, there was no withdrawal and rededication.

Alternatively, the rededication theory could work if the federal government through its own acts rededicated the land for pipeline purposes prior to July 1971. Alyeska has submitted no evidence, however, that the government intended to extinguish inchoate native allotment rights in favor of the pipeline right of way at such an early date.[8]

Alyeska bases a number of additional arguments on the Trans-Alaska Pipeline Act, 43 U.S.C. § 1651 *et seq.,* and 30 U.S.C. § 185 (as amended 1973). These arguments fail for two reasons. First, Arctic John's allotment rights were vested at the time of these acts. There is no indication that Congress intended these acts to destroy vested native allotment rights, the rule generally being that once rights have vested, Congress no longer can withdraw the land for other purposes. *See, e.g., Assiniboine & Sioux Tribes v. Nordwick,* 378 F.2d 426 (9th Cir.1967) (land remains subject to disposing powers of Congress only until it vests).

■ Second, Congress made all grants of rights of way under the Trans-Alaska Pipeline Act subject to 30 U.S.C. § 185. 43 U.S.C. § 1652(c) (1982). That section excludes "lands held in trust for an Indian" from federal lands over which right of way can be granted. 30 U.S.C. § 185(b)(1) (1982). The court finds that once Arctic John's allotment had vested and he had equitable title to it, the United States' legal title was held in trust for him. Accordingly, neither the Trans-Alaska Pipeline Act nor 30 U.S.C. § 185 could serve to pass any title to Alyeska.

The court's conclusion in its August 23, 1983 Memorandum and Order that the lands were not held "in trust" was based on an erroneous reading of *No Oilport! v. Carter,* 520 F.Supp. 334, 360 (W.D.Wa. 1981). The conclusion in *No Oilport!* that 30 U.S.C. § 185(b)(1) applied to lands "held in fee" only meant that the section did not apply to lands held by private parties over which the Indians had treaty-created access easements. In other words, the presence of an easement did not turn otherwise private lands into federal lands. Here, the government did own the lands in fee at the

---

7. Rights to a native allotment vest upon filing of an application. *See, e.g., United States v. Flynn,* 53 IBLA 208 (1981); *See also Assinboine & Sioux Tribes v. Nordwick,* 378 F.2d 426, 428–29 (9th Cir.1967) (land remains subject to the disposing power of Congress until entryman satisfies last condition imposed by law for the issuance of a patent.)

8. P.L.O. 5150, dated December 31, 1971, potentially was such a withdrawal and rededication. The court need not decide today whether this order would bar allotment applications filed after 1971. *But cf. Floyd L. Anderson, Sr.,* 42 IBLA 280, 282 (implying withdrawal prior to application may not prevent vesting).

time of the F–12505 conveyance and accordingly the statute applies.

### III. *Estoppel Against the Government*

■ Alyeska next argues that the government should be estopped from denying the validity of the 1977 right of way agreement. Since Arctic John had been issued a restricted patent prior to the 1977 agreement, Alyeska in effect is arguing that the BIA should be estopped from denying that Kathy Adams' signature constituted a proper approval of a right-of-way application under 25 C.F.R. part 169 (1985).

Alyeska's argument fails for a number of reasons. The court initially finds that the factual record is incomplete. No evidence has been introduced on Alyeska's state of mind regarding this agreement. Summary judgment must therefore be denied because Alyeska has not established by affidavit or other admissible evidence: (1) that it was ignorant of the facts; or (2) that it relied upon the government's conduct, *i.e.*, that it believed the agreement, without more, transferred to it a fee interest in the valve site.

Estoppel does not apply for other reasons as well. If one assumes that Alyeska believed that no allotment had been issued, any reliance on the approval could not have been reasonable. This is because Alyeska had been put on notice by the 1975 agreement that BIA did not have the authority to officially approve any allotment until it was issued. *See also* Exhibits A & B, attached to the Affidavit of Harris Saxon, Docket # 133, F81–050.

If one assumes that Alyeska knew in 1977 that the patent had issued to Arctic John, as it appears to argue for the first time in its reply brief (Docket # 141 at 18–19), reliance again is unreasonable. First, Alyeska was on notice that only the Area Director in Juneau was authorized to grant official consent. *See* Ex. B at 1, Docket # 133, F81–050. Second, if Alyeska knew that patent had issued, it should also have known that it was required to follow the procedures now contained in 25 C.F.R. part 169 to obtain proper BIA consent.

*See, e.g.*, Letter from BIA to Harris Saxon, May 27, 1975 (quoted on pages 3–4 *supra*). Alyeska never made the slightest attempt to follow these regulations. It is unreasonable for Alyeska to rely on its supposed ignorance of these regulations to create estoppel against the government.

### IV. *Removal of Pipeline*

Esther John Etalook's prayer for relief that the pipeline be removed from the allotment is dismissed as moot.

### V. *Damages for Trespass*

■ The court finds that the profitability of improvements is an improper measure of damages. The case relied on by Esther John Etalook, *Edwards v. Lee's Administrator*, 265 Ky. 418, 96 S.W.2d 1028 (1936), is in essence a "resource conversion" case, the holding of which is inapplicable here. *See, e.g.*, *Triple Elkhorn Mining Co. v. Anderson*, 646 S.W.2d 725 (1983); *Kentucky Mountain Coal Co. v. Hackes*, 412 S.W.2d 581 (Ky.App.1967). *See also Ostrem v. Alyeska Pipeline Service Co.*, 648 P.2d 986 (Alaska 1982) (holding loss in value to plaintiff or restoration, if possible, measure of damages available in pipeline trespass action). Damages available in this action should either be measured by the reasonable rental value of use, *Kentucky Mountain Coal Co., supra*, or loss in value of land to plaintiff. *Ostrem, supra*. Further, Alyeska would have available as an offset to any damages the $28,500 paid to Arctic John for the invalid right of way.

### VI. *Trespass Statute of Limitations*

■ Esther John Etalook did not oppose Alyeska's motion to bar certain trespass damages occurring more than six years before the filing of its quiet title complaint on December 17, 1981. The court finds Alyeska's motion well taken and grants it. *See* Alaska Stat. § 09.10.050(2); *Cacioppo v. Southwestern Bell Telephone Co.*, 550 S.W.2d 919, 915 (Mo.App.1977). *See also* Local Rule 5(B)(4). Accordingly it is ordered that no trespass damages are avail-

able for any activities occurring prior to December 17, 1975, including the circumstances surrounding Alyeska's initial entry upon Arctic John's allotment.

## VII. *Punitive Damages*

■ Esther John has also not opposed Alyeska's motion to dismiss her punitive damages claim. In order to be awarded punitive damages Esther John must show "outrageous" conduct. While actual malice need not be shown, plaintiff must show at a minimum "reckless indifference to the rights of others, and conscious action in deliberate disregard of them." *Alyeska Pipeline Service Co. v. Anderson*, 629 P.2d 512, 527 (Alaska 1981). The court finds there are no facts in the record that would support a finding of reckless indifference and accordingly grants the motion.[9]

As noted above, Alyeska did not become aware of Arctic John's allotment until late in 1974. Although any further construction after that point could constitute willful trespass, a number of factors prevent such trespass from being "outrageous." First, at that point moving the pipeline to another location was not a realistic option available to Alyeska. Sullivan Deposition at 85, Docket # 80, F83–037. Thus, Alyeska's failure to move the pipeline or stop construction does not represent reckless indifference.

This lack of recklessness is supported by a second factor as well—Alyeska's belief that the right of way could always be obtained by condemnation.[10] Given that Alyeska believed, in the absence of a settlement, the land could be obtained by condemnation, continued use of the land in the absence of any alternative to that use does not represent reckless indifference. *See also Arco Pipeline Co. v. 3.60 Acres, More or Less*, 539 P.2d 64 (Alaska 1975) (evidencing reasonableness of Alyeska's belief in feasibility of condemnation).

Third, good faith would exist if Alyeska reasonably believed that it could enter into a subsequent, satisfactory agreement for an easement allowing its use. *Ostrem v. Alyeska Pipeline Service Co.*, 648 P.2d 986, 989 n. 8 (Alaska 1982); *Schafer v. Schnabel*, 494 P.2d 802, 805 (Alaska 1972). That Alyeska in fact promptly entered into settlement negotiations with Arctic John and willingly paid considerably more than the market value for the easement evidences that Alyeska reasonably believed it could obtain subsequent agreement. In any event, Alyeska's willingness to negotiate and settle its claims on a fair basis (as shown by BIA's failure to object) shows that it lacked any motive to harm or oppress Arctic John, or to disregard his rights.

The above analysis applies with equal vigor to the events leading up to the 1977 valve-site agreement. Again, although the record shows a deliberate trespass, Alyeska's belief in the availability of a condemnation action, along with its willingness to compensate Arctic John shows there was no intent to oppress or overreach. *See also Alyeska Pipeline Service Co. v. Anderson*, 629 P.2d 512, 530 (Alaska 1981) (holding trial court did not err in dismissing punitive damage claim, despite presence of willful trespass).

## VIII. *Title to Improvements in Condemnation*

### A. *Law of the Case*

■ Alyeska argues that this court should be bound by its May 3, 1982 order. In this order, the court found that Alaska's entry was in good faith and therefore a condemnation award did not need to include the value of any improvements built on the easement. The court finds that adherence to the 1982 order without reexamination of its validity is improper because (1) it was based on an undeveloped factual record; and (2) it is not clear that any

---

**9.** The court notes that, in any event, acts committed prior to December 17, 1975 cannot be the basis of a punitive damage claim because of the statute of limitations defense.

**10.** It is Alyeska's belief that it had condemnation authority that is relevant, not whether Alyeska actually had such authority.

decision regarding the State of Alaska automatically applies to Alyeska.

### B. *Condemnation of Improvements*

Esther John argues in her motion to compel defendants to deposit additional funds with the court that Alyeska is required to condemn not only the unimproved right of way but improvements built upon it by Alyeska. If the court were to grant this motion, the size of the condemnation award would be in the millions of dollars, as opposed to $10,000—$20,000, the approximate value of the land taken. In support of this motion, Esther John relies on the general rule that a trespasser who builds on another's land dedicates his structure to the other.

After reviewing a number of cases in this area, the court finds that pure trespass cases are not persuasive authority for situations, such as the present one, that involve trespass by an authority with the power of eminent domain. In the case of an improving trespasser, courts are placed on the horns of a dilemma. They can either force the land owner to buy the improvements from the trespasser or sell the property to him, or they can order that the trespasser forfeit his improvements, creating a windfall for the land owner. Particularly in the case of a good faith trespasser, any solutions will create an inequitable hardship to one of the parties. Nevertheless, courts have generally chosen to protect the original land owner because of the sanctity accorded to property ownership by the United States legal system. *See generally* J. Merryman, *Improving the Lot of the Improving Trespasser*, 11 Stan.L.Rev. 456 (1959).

Where, however, the trespasser has condemnation authority, the dilemma no longer exists. Sale to the condemnor can be accomplished through the use of eminent domain authority. The courts consequently no longer need to protect the innocent land owner from the prospect of forced sale/forced purchase of improvements, as a sale can be legally forced upon him in any event. Additionally, the court no longer need worry about protecting the land owner's title for the reason the state has decreed that the condemnor's public purpose takes precedence over the land owner's title. Thus, the primary role of courts is to assure that the land owner receives just compensation for injuries received. *See, e.g., Searl v. School District No. 2*, 133 U.S. 553, 564, 10 S.Ct. 374, 377, 33 L.Ed. 740 (1890) ("inquiry was limited to such compensation as was just and did not embrace ... payment for injuries not properly susceptible of being claimed to have been sustained"); *State v. Alaska Continental Development Corp.*, 630 P.2d 977, 983 (1980) (discussing just compensation).

The rule has been stated by several courts that: "the general rule as to things affixed to the freehold by a trespasser ... is not applicable as against a body having the power of eminent domain, and entering without leave, and making improvements for the public for which it was created and given such power." *Anderson-Tully Co. v. United States*, 189 F.2d 192, 197 (5th Cir.1951); *Berry v. United Gas Pipe Line Co.*, 370 So.2d 235 (Miss.1979); *see also Searl v. School Dist. No. 2, supra* (leading case in area); *Nichols' The Law of Eminent Domain*, § 13.15 (3d rev. ed. 1985) (generally supporting view that compensation for improvements not required).

The court finds no reason not to apply this rule in the present case. The pipeline condemnation was a "public use." *Arco Pipeline Co. v. 3.60 Acres, More or Less*, 539 P.2d 64, 72 (Alaska 1975). Nor does the fact that Alyeska did not receive condemnation authority until after entry affect the result. *Searl*, 133 U.S. at 564, 10 S.Ct. at 377. Finally, it is irrelevant to the above rule whether Alyeska's initial entry was in good faith or willful,[11] so long as there is an absence of subjective bad

---

11. The primary remedy for illegal entry up to the time of condemnation is trespass damages. These damages will serve to make a plaintiff in Arctic John's position whole. Requiring Alyeska to now condemn the improvements it built would lead to double recovery.

faith. *See id.* at 562–64, 10 S.Ct. at 377. No such bad faith as would require a punitive award of damages exists in this case. *See* Part VII, *supra.*

### C. *Estoppel Against Arctic John*

The court declines to address whether Esther John can be estopped from claiming the improvements. The disposition of this issue is not necessary in light of the court's holding that the condemnation award need not include the value of improvements.[12]

Accordingly, IT IS ORDERED:

(1) THAT Alyeska's motion to quiet title is granted in part as follows:

A. THAT the prayer for relief that the pipeline be removed from the allotment is dismissed as moot;

B. THAT profitability of improvements is an improper measure of damages in this action;

C. THAT damages for any trespass occurring prior to December 17, 1975 are barred by the statute of limitations;

D. THAT Esther John Etalook's claim for punitive damages is dismissed;

E. THAT the condemnation award in these actions is limited to the value of the unimproved land and does not include the value of improvements built by Alyeska or the State of Alaska, and further, that title to the improvements is quieted in the name of the State of Alaska and Alyeska, respectively; and

THAT Alyeska's motion is otherwise denied;

(2) THAT Esther John Etalook's motion to compel deposit of additional funds is denied;

(3) THAT Alyeska's motion for protective order is granted; and

(4) THAT Alyeska's motion to strike certain pleadings is denied.

12. In any event, whether Arctic John's withdrawal of consent was in good faith and whether Alyeska's representatives made misrepresentations are unresolved factual issues preventing grant of summary judgment.