38 F.3d 1068
 STATE OF ALASKA, Plaintiff-Appellant,
v.
Bruce BABBITT, Secretary of the United States Department of
the Interior; Thomas Albert; and Virginia Albert
on behalf of Sammy Albert, a minor,
Defendants-Appellees.
 No. 93-35684.
 United States Court of Appeals,
Ninth Circuit.
 Submitted June 9, 1994.*
Decided Oct. 11, 1994.
 
 1
 John T. Baker, Asst. Atty. Gen., Anchorage, AK, for plaintiff-appellant.
 
 
 2
 Jacques B. Gelin, Jeffrey P. Kehne, U.S. Dept. of Justice, Washington, DC, for defendant-appellee Secretary of the Interior.
 
 
 3
 Judith K. Bush, William E. Caldwell, Alaska Legal Services Corp., Fairbanks, AK, Carol H. Daniel, Alaska Legal Services Corp., Anchorage, AK, for defendant-appellee Thomas Albert, Virginia Albert for Sammy Albert, a minor.
 
 
 4
 Appeal from the United States District Court for the District of Alaska.
 
 
 5
 Before WIGGINS and THOMPSON, Circuit Judges, EZRA,** District Judge.
 
 DAVID ALLEN EZRA, District Judge:
 
 6
 The State of Alaska ("State" or "Alaska") appeals the district court's order dismissing its complaint for lack of subject matter jurisdiction. The issue presented is whether the Indian lands exception to the Quiet Title Act, 28 U.S.C. Sec. 2409a, precludes the State from invoking the jurisdiction of the district court to review a final administrative agency decision pursuant to Section 702 of the Administrative Procedures Act, 5 U.S.C. Sec. 702. For the reasons discussed below, we affirm.
 
 Factual and Procedural Background
 
 7
 This case involves a Native allotment claim of Dinah Albert ("Albert"), now deceased, that is now being pursued by her heirs. On January 11, 1966, Albert filed an application pursuant to the Alaska Native Allotment Act of 1906 ("1906 Allotment Act")[1], which authorized the Secretary of the Interior (the "Secretary") to allot up to 160 acres of land to any Alaska Native as a homestead. Albert's application described property consisting of an island located in the middle of the Tanana River near Nenana, Alaska, which she claimed to have used since 1938. On April 19, 1966, Albert signed a document relinquishing her claim to the island. On September 12, 1967, Albert filed another allotment application which described and claimed "T. 4 S., R. 8 W., F.M. Sec. 14: Lot 3." On February 6, 1968, Albert filed a third application, claiming "[a]n island in the Tanana River near Nenana once described as lot 4, section 14, T. 4 S., R. 8 W., F.M. containing 20.36 acres." The "Lot 4" claimed in the 1968 application was asserted to be "an island in the Tanana River adjacent to the island described in Lot 3." At some time after 1968, the two islands became joined as one island.
 
 
 8
 The State applied for a highway right-of-way on November 2, 1965, which was granted by the Bureau of Land Management ("BLM") on December 9, 1965, pursuant to the Federal Highway Act, 23 U.S.C. Sec. 317. On August 15, 1966, the State applied for another right-of-way, which the BLM granted on November 16, 1966. Each of the rights-of-way described lands contained in Albert's 1968 allotment application. The rights-of-way were granted subject to "valid existing rights."
 
 
 9
 The BLM conducted field examinations of the Albert allotment claim in 1969 and 1974, and, by letter dated February 7, 1975, informed the claimants that the allotment had been approved and that, following further survey approval, further action would be taken to issue the allotment certificate.
 
 
 10
 On December 2, 1980, Congress passed the Alaska National Interest Lands Conservation Act ("ANILCA")[2]. Section 905(a)(1) of ANILCA provides that, "subject to valid existing rights," all Alaska Native allotment applications pending before the Department of the Interior on or before December 18, 1971, would be approved unless private parties or the State filed specific protests within 180 days of the effective date of the Act (June 1, 1981). See 43 U.S.C. Sec. 1634(a)(1). In December of 1982, the State filed a private contest complaint with the BLM challenging Albert's entitlement to land described in her allotment and seeking to establish its continuing entitlement to a right-of-way.[3] The administrative law judge ("ALJ") concluded that the State's protest was not untimely and that, although Albert had satisfied the allotment requirements, her allotment was subject to the State's rights-of-way.
 
 
 11
 Both parties appealed the ALJ's decision. On December 4, 1985, in Alaska v. Heirs of Dinah Albert, 90 IBLA 14 (1985) ("Alaska I "), the Interior Board of Land Appeals ("IBLA") affirmed in part and reversed in part the ALJ's decision, holding that the State's appeal was untimely. The IBLA also ruled that the ALJ should have dismissed the contest as untimely as well: since the State did not file its private contest until 1982, after the expiration of ANILCA's statutory 180-day time period, the State was time-barred from challenging the validity of Albert's allotment. Id. at 21. However, the IBLA also preserved the State's rights-of-way, reasoning that Albert's "inchoate preference right did not become a vested right until the filing of her application," and that "[t]he vesting of the allotment and the subsequent approval of the allotment [could not] defeat the previously granted State rights-of-way." Id. at 21-22.
 
 
 12
 Two years after Alaska I, the IBLA, in an unrelated case, abandoned its position that a vested federal highway right-of-way would take precedence over an inchoate, later-filed Native allotment claim. Golden Valley Electric Ass'n (On Reconsideration), 98 IBLA 203 (1987) ("Golden Valley "). After stating its holding concerning rights-of-way in general terms, the IBLA in Golden Valley expressly referred to its previous ruling in Alaska I, although neither the State nor Albert was a party to Golden Valley, and neither had sought to re-open Alaska I within the Golden Valley proceeding. The IBLA stated that the conclusion reached in Alaska I needed to be qualified in light of the "shift in BLM's policy regarding the issuance of allotment certificates subject to rights-of-way." 98 IBLA at 207 n. 1. The IBLA went on to state as follows:
 
 
 13
 Albert's inchoate preference right could defeat the previously issued rights-of-way if her use and occupancy was open and notorious at the time the right-of-way grants issued such that it would have disclosed to an observer on the ground that the land was under active development or use.... For that reason, our statement in Albert is modified to the extent it is inconsistent with our present analysis.
 
 
 14
 Id. at 207.
 
 
 15
 As a result of the IBLA's decision in Golden Valley, the BLM, on October 2, 1987, declared that the State's rights-of-way were null and void, finding that Albert's use and occupancy of the island had been open and notorious since 1938, creating an inchoate preference right that defeated the State's rights-of-way. The State appealed, but the IBLA, in Alaska, Golden Valley Elec. Ass'n, 110 IBLA 224 (1989) ("Alaska II "), affirmed the BLM's invalidation of the State's rights-of-way on August 24, 1989. Alaska then commenced an action in the United States District Court for the District of Alaska under the Administrative Procedures Act, 5 U.S.C. Sec. 702 ("APA"), seeking judicial review of the IBLA's decision.
 
 
 16
 On May 19, 1993, the district court entered judgment for the government and dismissed the action on jurisdictional grounds. The court found that Alaska's claim represented a challenge to an interest claimed by the United States in real property and thus fell within the scope of the Quiet Title Act, 28 U.S.C. Sec. 2409a (the "QTA"). The district court found that, because the QTA precludes suits against the United States concerning title to "trust or restricted Indian lands," the State's action was barred by the absence of an effective waiver of sovereign immunity. This appeal followed.
 
 Standard of Review
 
 17
 Subject matter jurisdiction determinations are subject to de novo review. North Star Alaska v. United States, 9 F.3d 1430, 1432 (9th Cir.1993) (en banc). The district court's factual findings on jurisdictional issues must be accepted unless clearly erroneous. Elias v. Connett, 908 F.2d 521, 523 (9th Cir.1990).
 
 Discussion
 
 18
 Federal sovereign immunity insulates the United States from suit "in the absence of an express waiver of this immunity from Congress." Block v. North Dakota, 461 U.S. 273, 280, 103 S.Ct. 1811, 1816, 75 L.Ed.2d 840 (1983). Such waivers, to be effective, must be "unequivocally expressed," and the government's consent to be sued must be construed "strictly in favor of the sovereign." United States v. Nordic Village, Inc., --- U.S. ----, ---- - ----, 112 S.Ct. 1011, 1014-15, 117 L.Ed.2d 181 (1992) (citations omitted). In this case, Alaska seeks review of the IBLA's August 24, 1989 ruling by invoking the congressional waiver of sovereign immunity contained in the APA. The APA provides for judicial review of agency decisions as follows:
 
 
 19
 A person suffering legal wrong because of agency action ... is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency ... acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.... Nothing herein ... confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.
 
 
 20
 5 U.S.C. Sec. 702 (1977) (emphasis added). Thus, under the APA, the United States waives its sovereign immunity when a person has suffered some legal wrong as a result of an agency decision, except where some other statute controls. In this case, the district court found that the QTA was such an "other statute," and that judicial review under the APA was precluded under the QTA's express terms.
 
 
 21
 By enacting the QTA, Congress waived, with certain important exceptions, the government's sovereign immunity when the government is a party to a dispute over title to a parcel of land. The QTA provides as follows:
 
 
 22
 The United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest, other than a security interest or water rights. This section does not apply to trust or restricted Indian lands....
 
 
 23
 28 U.S.C. Sec. 2409a(a) (1978) (emphasis added). Thus, the QTA waives sovereign immunity where the United States has an interest in the disputed property, unless the property is "trust or restricted Indian land."[4] The United States Supreme Court has held that "[o]nly upon passage of the QTA did the United States waive its immunity with respect to suits involving title to land." Block, 461 U.S. at 280, 103 S.Ct. at 1816. Thus the QTA is the "exclusive means by which adverse claimants [can] challenge the United States' title to real property." Id. at 286, 103 S.Ct. at 1819. The Court in Block explicitly rejected the theory that one could avoid the limitations of the QTA by bringing an action under the APA. Id. at 286 n. 22, 103 S.Ct. at 1819 n. 22. Consequently, when the United States has an interest in the disputed property, the waiver of sovereign immunity must be found, if at all, within the QTA.
 
 
 24
 The Supreme Court has noted that "when the United States claims an interest in real property based on that property's status as trust or restricted Indian lands, the Quiet Title Act does not waive the government's immunity." United States v. Mottaz, 476 U.S. 834, 843, 106 S.Ct. 2224, 2230, 90 L.Ed.2d 841 (1986).[5] Further, this court has previously held that "[n]othing in the [QTA] or its history suggests that the United States was to be put to the burden of establishing its title when it has a colorable claim and has chosen to assert its immunity on behalf of land of which the government declares that it is the trustee for Indians." Wildman v. United States, 827 F.2d 1306, 1309 (9th Cir.1987).
 
 
 25
 A Native occupant's filing of a timely application under the 1906 Allotment Act vests his or her preference rights to the land. Alaska v. 13.90 Acres of Land, 625 F.Supp. 1315, 1319 (D.Alaska 1985), aff'd sub nom., Etalook v. Exxon Pipeline Co., 831 F.2d 1440 (9th Cir.1987). Once such an allotment is vested and the occupant gains equitable title to it, the United States' legal title is held in trust for the occupant. Id. at 1320. In this case, Albert filed valid allotment applications in September, 1967 and in February, 1968. Title to the Albert allotment is still being held by the government in trust for Albert's descendants. Thus, the United States remains in the position of trustee of this property pending completion of the allotment process. The government's interest in the lands described in Albert's allotment applications is, therefore, of the type contemplated by the "trust or restricted Indian lands" limitation of the QTA.[6]
 
 
 26
 The State attempts to avoid the QTA's jurisdictional limitation by asserting that it is not seeking to adjudicate a disputed title to real property. The State asserts that it is not asserting a title interest in the Albert allotment, but rather only a claim to highway rights-of-way. Because it is not seeking to diminish Albert heirs' quality of title, or the amount of land which they are legally capable of receiving, the State suggests that the QTA's Indian lands exception should not apply to this suit. The State argues that, in enacting the Indian lands exception to the QTA, Congress was most concerned with precluding direct actions which challenge title to, and the boundaries of, Indian reservations.
 
 
 27
 Alaska's argument is unpersuasive. This court has reviewed several property claims against the United States involving less than fee simple interests where jurisdiction was based on the QTA. See, e.g., Shultz v. Department of Army, 886 F.2d 1157 (9th Cir.1989) (involving a private landowner's public right of access to a road closed by the Army); Narramore v. United States, 852 F.2d 485 (9th Cir.1988) (involving the enforcement of flowage easements within the Painted Rock Reservoir); Humboldt County v. United States, 684 F.2d 1276 (9th Cir.1982) (involving a county's claim to rights-of-way over roads on public lands); Park County, Montana v. United States, 626 F.2d 718 (9th Cir.1980), cert. denied, 449 U.S. 1112, 101 S.Ct. 923, 66 L.Ed.2d 841 (1981) (involving counties' claimed rights-of-way over roads in Gallatin National Forest). Furthermore, this court has stated that the Indian lands exception to the QTA constitutes an "insuperable hurdle" to a suit to establish title to an easement across reservation land. See Imperial Granite Co. v. Pala Band of Mission Indians, 940 F.2d 1269, 1272 n. 4 (9th Cir.1991). Thus, both the QTA's general waiver of sovereign immunity, as well as its exception for Indian lands, apply to cases involving claims for less than fee simple title interests to disputed property.
 
 
 28
 Alaska makes the additional argument that the QTA does not limit sovereign immunity in this case because the State is not seeking to quiet title in "others than the Albert heirs." In so arguing, Alaska relies upon this court's holding in Metropolitan Water Dist. of Southern California v. United States, 830 F.2d 139 (9th Cir.1987), aff'd sub nom., California v. United States, 490 U.S. 920, 109 S.Ct. 2273, 104 L.Ed.2d 981 (1989). In that case, MWD, a water wholesaler, challenged the Secretary's decision to resurvey the boundaries of the Fort Mojave Indian Reservation. The United States defended under the Indian lands exception to the QTA. In response, MWD argued that the QTA was inapplicable because the MWD was not seeking to quiet title in itself. The court rejected this argument, stating:
 
 
 29
 Although MWD may not be seeking to quiet title to the land in itself, it seeks a determination of the boundaries of the Reservation. The effect of a successful challenge would be to quiet title in others than the Tribe.
 
 
 30
 Id. at 143. In arguing that the QTA should not apply to the case at bar, Alaska argues that, in contrast to the challenge in Metropolitan Water District, its challenge here would not, if successful, quiet title in "others than the Albert heirs."
 
 
 31
 Alaska misreads Metropolitan Water District. In that case, this court did not, as the State appears to believe, limit the QTA's applicability to suits in which third parties would potentially have their titles to property quieted. Such a reading would not only tend to obfuscate the plain wording of the QTA, but would ignore the multitude of cases in which courts have applied the QTA to allow (or to disallow, as the case may be) individuals to adjudicate property disputes affecting no one but themselves. If anything, Metropolitan Water District expanded the application of the QTA to govern suits involving plaintiffs who, while not seeking to quiet title in themselves, might potentially affect the property rights of others through successfully litigating their claims.
 
 
 32
 Alaska also argues that since, in this case, "the United States initiated the entire chain of events leading to the present appeal," the government should not now be entitled to the defense of sovereign immunity under the QTA. According to Alaska, the United States initiated administrative proceedings for the purpose of taking action against the State's property interests. The State maintains that it is "not in an offensive posture" with regard to the Albert allotment, but rather has "reacted" at each stage at which the United States has initiated action adverse to the State's rights-of-way. Alaska asserts that, in these circumstances, its action should not be barred.
 
 
 33
 In so arguing, Alaska once again relies upon this court's decision in Metropolitan Water District. In that case, the court discussed the possibility of an application to the Supreme Court, initiated by the United States, for the reallocation of water from the Colorado River under a continuing decree. The court indicated that, by making such an application, the United States would effectively consent to a full adjudication, and would not be able to claim sovereign immunity to avoid challenge to the propriety of the water allocation. Id. at 143 n. 6. The State contends that the reasoning of Metropolitan Water District is relevant to the case at bar, since the "the Secretary has initiated the action upon which the scope of trust status itself is dependent," and because this action is "directly adverse to vested property rights."
 
 
 34
 Alaska's argument is again without merit. In Metropolitan Water District, this court held that the QTA displaces APA review of administrative decisions affecting title to land in which the United States claims an interest based upon that property's status as trust or restricted Indian land. Id. (citing Block, 461 U.S. at 286 n. 22, 103 S.Ct. at n. 22) Nothing in Metropolitan Water District suggests that a federal agency, by undertaking administrative action affecting a party's interest in real property, can relax the QTA's limitations on congressional consent to title disputes against the United States. Alaska's reliance on its "defensive" posture here is misguided: the State is the party appealing from an adverse administrative decision in this case. The fact that the State seeks review of this decision does not confer jurisdiction where expressly forbidden by the QTA. Unlike the scenario contemplated in footnote 6 of Metropolitan Water District, the government's posture in this case, for purposes of invoking sovereign immunity under the QTA, is that of trustee of the property described in Albert's allotment.
 
 
 35
 The State next argues that the Department of the Interior lacked the legal authority to create trust property without preserving Alaska's "intervening vested rights." The State contends that Albert's 1966 relinquishment of her first allotment claim amounted to an abandonment of the property sufficient to eradicate any prior existing rights she may have had. The State asserts that Albert never appealed the IBLA's determination in Alaska I that she had knowingly and voluntarily relinquished her claim, and that the IBLA's subsequent decision in Alaska II did not reverse this earlier holding. Alaska argues that the doctrine of administrative res judicata thus bars the defendants from denying the legal effect of Albert's relinquishment.
 
 
 36
 In so arguing, the State essentially attacks the merits of the IBLA's decision in Alaska II, wherein the IBLA concluded that the legislative approval of Albert's allotment pursuant to Section 905(a) of ANILCA precluded "any additional inquiry of any kind into the facts of Albert's use and occupancy of the land." 110 IBLA at 229. The IBLA went on to state as follows:
 
 
 37
 Under controlling case law, Albert's allotment relates back to the initiation of her occupancy of the land, which as a matter of record was 1938; therefore, only a valid existing right could survive her allotment. The rights-of-way, approved in the mid-1960's, cannot be considered valid existing rights since they did not come into existence until long after initiation of Albert's allotment. Those rights-of-way, however, each were issued subject to valid existing rights. The allotment, under the relation back doctrine, is such a right. For that reason, we are compelled to the conclusion that legislative approval of the allotment necessitated BLM's action in declaring the rights-of-way null and void to the extent they cross allotment F-035085.
 
 
 38
 Id.
 
 
 39
 In criticizing the IBLA's findings, the State replicates the arguments contained in Administrative Judge Burski's concurring opinion in Alaska Dep't of Transp. & Pub. Facilities, 124 IBLA 386 (1992), which set forth a detailed analysis of the IBLA's decision in Alaska II. Judge Burski found that "there is nothing in the legislative approval of Native allotments which evinces an intent to relate back to any date." Id. at 396. Judge Burski further stated that the decision in Alaska II ignored the point that the relation back doctrine only applies in the absence of intervening rights. Accordingly, Judge Burski found that, since legislative approval is, itself, expressly made "subject to valid existing rights," the presence of an intervening right-of-way would not defeat an allotment, but would merely, under Section 905, make the allotment subject to the right-of-way. Id.
 
 
 40
 The fact that the State prefers Judge Burski's result to that reached by the Board in Alaska II is irrelevant to this appeal. The QTA's limitations on actions challenging the United States' assertions of title apply without regard to the ultimate validity of those assertions. As this court has previously stated, "[t]he immunity of the government applies whether the government is right or wrong." Wildman, 827 F.2d at 1309. Indeed, "[t]he very purpose of the doctrine is to prevent a judicial examination of the merits of the government's position." Id. To the extent that the QTA allows any inquiry on the merits, that inquiry can extend no further than a determination that the government had some rationale for its claim. As noted above, the Wildman court held that "[n]othing in the [QTA] or its history suggests that the United States was to be put to the burden of establishing its title when it has a colorable claim and has chosen to assert its immunity on behalf of land of which the government declares that it is the trustee for Indians." Id. (emphasis added).
 
 
 41
 In this case, the United States has, at the very least, a "colorable claim" regarding the property in dispute. Because the allotment is still unpatented, the government presently has a trust interest in the disputed property; the scope of this trust status is the same, whether or not the State controls rights-of-way over the lands. Furthermore, the IBLA's "relation back" analysis in Alaska II was based upon its reasoned interpretation of such cases as Alaska v. 13.90 Acres of Land, 625 F.Supp. 1315, 1319 (D.Alaska 1985), aff'd sub nom., Etalook v. Exxon Pipeline Co., 831 F.2d 1440 (9th Cir.1987), and Aguilar v. United States, 474 F.Supp. 840, 845 (D.Alaska 1979), and thus was not undertaken in either an arbitrary or frivolous manner.
 
 
 42
 This court has long recognized that sovereign immunity does not bar an action for judicial review of an agency decision where (1) the government officer's powers are limited by statute and his actions are ultra vires, or (2) the officer acts unconstitutionally or pursuant to an unconstitutional grant of power from the sovereign. Washington v. Udall, 417 F.2d 1310, 1314 (9th Cir.1969). With regard to the IBLA's decision in Alaska II, neither of these elements has been established. The State has not alleged that the Secretary acted unconstitutionally, and there is absolutely no indication that the IBLA acted outside its statutory authority in making its determinations regarding the preclusive effect of legislative approval and the relation back of Albert's valid existing rights. Even though Alaska's arguments on the merits may be compelling, and the IBLA's decision may have been erroneous, there is no evidence of the agency's having exceeded its statutory authority in ruling as it did, to the extent it modified its analysis in Alaska I.[7]
 
 
 43
 Finally, the State makes the policy argument that this court should narrow the scope of the Indian lands exception to the QTA in light of the "practical effects of allowing the United States to claim immunity" under the circumstances of this case. The State notes that, regardless of the outcome of this case, it will remain in possession of the bridge crossing the Tanana River. Moreover, based upon the State's briefs, it appears that the State anticipates that the Albert heirs will wish to quiet title in this property, or to bring a trespass or ejectment action against the State. The State notes that it would be entitled to Eleventh Amendment immunity if such a situation arises, thus requiring the United States to bring suit on behalf of the Albert heirs. The State acknowledges that, if such an action were brought, the United States would be expected to claim immunity from any of Alaska's counterclaims. The State urges the court to disallow this result, arguing that "[i]t is fundamental ... that departure from the literal construction of a statute is justified when such a construction ... would clearly be inconsistent with the purposes and policies of the act in question." Foxgord v. Hischemoeller, 820 F.2d 1030, 1034 (9th Cir.) (quoting 2A N. Singer, Sutherland Statutory Construction Sec. 45.12, at 54 (Sands 4th ed. 1984)), cert. denied, 484 U.S. 986, 108 S.Ct. 503, 98 L.Ed.2d 502 (1987).
 
 
 44
 Alaska's arguments have no bearing on this court's reading of the QTA's limited waiver of sovereign immunity. Congress's unambiguous retention of sovereign immunity against quiet-title actions affecting trust and restricted Indian lands applies without regard to the availability of alternative means of review. As this court has previously stated: "[L]ack of an alternative forum does not automatically prevent dismissal of a suit. Sovereign immunity may leave a party with no forum for its claims." Makah Indian Tribe v. Verity, 910 F.2d 555, 560 (9th Cir.1990) (citation omitted).
 
 
 45
 Furthermore, the State's reliance on Foxgord is misplaced. In that case, we recognized the general principle that where a statute is clear on its face, "it is not necessary to look to its legislative history to discern its meaning and scope." Foxgord, 820 F.2d at 1034 (citing Tennessee Valley Authority v. Hill, 437 U.S. 153, 184 n. 29, 98 S.Ct. 2279, 2296 n. 29, 57 L.Ed.2d 117 (1978)). We held that, where a statute is unambiguous, judicial inquiry is complete "[u]nless exceptional circumstances dictate otherwise." Id. (quoting Burlington Northern R.R. Co. v. Oklahoma Tax Comm'r, 481 U.S. 454, 461, 107 S.Ct. 1855, 1859-60, 95 L.Ed.2d 404 (1987)). If such "exceptional circumstances" do exist, "[t]his court may give effect to a clearly expressed legislative intent which is contrary to the language of the statute itself." Id. Otherwise, "it is not necessary to look to [the statute's] legislative history to discern its meaning and scope." Id.
 
 
 46
 This case simply does not involve "exceptional circumstances" which would cause us to depart from the plain wording of the QTA and inquire further into its legislative history. It is unclear how disregarding the QTA's Indian lands exception in this case would reach a particularly just result. In fact, the State's arguments regarding foreclosure of judicial review would be applicable in most, if not all, cases in which the federal government asserts sovereign immunity. Furthermore, even if "exceptional circumstances" were implicated in this case, thus prompting our review of the QTA's legislative history, our holding today would not change. Based upon the parties' submissions and upon its own examination of the legislative history of the QTA, this court finds no "clearly expressed legislative intent" that the Indian lands exception should not apply, as Alaska contends, to cases in which the adversely affected party is precluded from further judicial review.
 
 Conclusion
 
 47
 For the foregoing reasons, we AFFIRM the district court's dismissal of the complaint for lack of subject matter jurisdiction.
 
 
 
 *
 The panel unanimously finds this case suitable for decision without oral argument. Fed.R.App.P. 34(a); 9th Cir.R. 34-4
 
 
 **
 The Honorable David Alan Ezra, United States District Judge for the District of Hawaii, sitting by designation
 
 
 [1]
 Act of May 17, 1906, 34 Stat. 197, as amended Aug. 2, 1956, 70 Stat. 954, 43 U.S.C. Secs. 270-1 through 270-3 (1970). The 1906 Allotment Act was repealed by Section 18(a) of the Alaska Native Claims Settlement Act ("ANCSA"), 43 U.S.C. Sec. 1617(a), which included a savings provision for allotment applications pending on December 18, 1971
 
 
 [2]
 Pub.L. No. 96-487, 94 Stat. 2435
 
 
 [3]
 On May 12, 1981, the State filed a protest pursuant to Section 905(a)(1) of ANILCA, alleging that the lands within Albert's allotment had been patented to the State. The BLM summarily dismissed the complaint, holding that the State had failed to meet ANILCA's stated criteria for a valid protest
 
 
 [4]
 The Indian land exception to the QTA was added by Congress for the following purpose:
 The federal government's trust responsibility for Indian lands is the result of solemn obligations entered into by the United States government. The federal government has over the years made specific commitments to the Indian people through written treaties and through informal and formal agreements. The Indians, for their part, have often surrendered claims to vast tracts of land. President Nixon has pledged his administration against abridging the historic relationship between the federal government and the Indians without the consent of the Indians.
 H.R.Rep. No. 1559, 92nd Cong., 2d Sess., reprinted in 1972 U.S.C.C.A.N. 4556-57.
 
 
 [5]
 In Mottaz the Native American plaintiff challenged the government's sale of her interest in three Indian allotments. The plaintiff sought to avoid the limitations of the QTA by characterizing her suit as a claim for an allotment under the General Allotment Act of 1887, 25 U.S.C. Sec. 331 et seq. That Act grants jurisdiction to the district courts over suits "involving the right ... to any allotment." 25 U.S.C. Sec. 345. The Court, in interpreting Section 345, found that the statute contemplated two types of suits involving allotments: those seeking the issuance of an allotment, and those involving "the interests and rights of the Indian in his allotment or patent after he has acquired it." Mottaz, 476 U.S. at 845, 106 S.Ct. at 2231. The Court, in rejecting plaintiff's claims, found that Section 345 waived sovereign immunity only with respect to the former class of cases: those seeking an original allotment. Id. at 845-46, 106 S.Ct. at 2231-32
 
 
 [6]
 If the United States claimed a property interest, not on behalf of the Native beneficiary of a trust, but in its own behalf, the QTA's waiver of sovereign immunity would apply. Mottaz, 476 U.S. at 843, 106 S.Ct. at 2230
 
 
 [7]
 The State asserts that the IBLA exceeded its authority in canceling the State's highway rights-of-way. In so arguing, the State apparently renews its challenge to the BLM's jurisdiction to declare such rights-of-way null and void. However, as the IBLA held in Alaska II, "[c]learly, where BLM issues a right-of-way subject to valid existing rights and subsequently it is determined that such rights exist, BLM has the jurisdiction to declare the right-of-way null and void." 110 IBLA at 230. In Alaska II the IBLA further noted that the BLM had given the State notice that its rights-of-way were being canceled, and had stated the grounds therefor. Id. The State was also provided the right to appeal the BLM's decision to the IBLA. Id
 Although obviously dissatisfied with the IBLA's decision to uphold the BLM's cancellation of its rights-of-way, the State fails to make any new argument as to why officers of the Department of the Interior acted unconstitutionally or exceeded their statutorily derived authority. "Only where the official's conduct cannot be attributed to the sovereign because the official had no power to do the alleged acts can it properly be said that the action is not one against the United States as sovereign." Florida v. United States Dep't of Interior, 768 F.2d 1248, 1252 (11th Cir.1985), cert. denied, 475 U.S. 1011, 106 S.Ct. 1186, 89 L.Ed.2d 302 (1986). Because the State has failed to provide any evidence that agency officials exceeded their authority in canceling its highway rights-of-way, this court may not engage in a review of the IBLA's decision.