**MESA GRANDE BAND OF MISSION INDIANS, Plaintiff,**

v.

**Kenneth L. SALAZAR, Secretary of the United States Department of the Interior, and Does 1–100, Defendants.**

**Case No. 08cv1544–LAB (NLS).**

United States District Court, S.D. California.

Sept. 25, 2009.

Edgar B. Washburn, Shaye Diveley, Morrison & Foerster LLP, San Francisco, CA, for Plaintiff.

Kristofor R. Swanson, U.S. Department of Justice, Washington, DC, Thomas C. Stahl, U.S. Attorneys Office, Southern District of California, San Diego, CA, for Defendants.

## ORDER GRANTING MOTION TO DISMISS

LARRY ALAN BURNS, District Judge.

On August 21, 2008, Plaintiff Mesa Grande Band of Diegueño Mission Indians ("Mesa Grande"), a federally-recognized Indian tribe, filed its complaint in this case against the U.S. Secretary of the Interior.[1] On December 30, 2008, Defendant moved to dismiss the complaint. Plaintiff then filed an amended complaint ("FAC"), but pursuant to the Court's order of February 18, 2009, the Motion was deemed to apply to the FAC.

The Motion is now fully briefed, and additional *ex parte* pleadings have been filed as well, including a motion to strike exhibits attached to the Motion (to which opposition and reply briefs were also filed), a supplemental brief with a request for oral argument, and a motion to strike the supplemental briefing.

## I. Background

This case arises from a dispute between two neighboring Indian tribes over beneficial title to several thousand acres of land in this district. Its origins stretch back over a century. According to the FAC, President Grant issued an executive order setting aside approximately 15,000 acres for Mission Indians in California known as "Santa Ysabel—including Mesa Grande." In a second order in 1883, President Arthur set aside 120 acres for the "Mesa Grande Indian Reservation."

In 1891, "An act for the relief of the Mission Indians in the State of California," 26 Stat. 712, was enacted. It established a commission to select reservations for the Mission Indians in California. *Id.*, § 2. The selection would be valid when approved by the President and Secretary of the Interior, after which the Secretary of State was to issue patents for each reservation. *Id.*, §§ 2, 3. Plaintiff alleges that after President Benjamin Harrison approved the report, patents were authorized for over 15,000 acres (also known as Tracts One, Two, and Three) to the Santa Ysabel Band, "including the Mesa Grande," and for 120 acres for the Mesa Grande Band. The patents were issued on February 10, 1893. Plaintiff alleges these patents "were a mistake and did not accurately reflect the intentions of the United States to issue patents for Tracts One and Two to Mesa Grande." (FAC, ¶ 14.)

In 1926 and 1988, Congress enacted legislation Plaintiff argues confirms Congress' understanding that Plaintiff was the proper patentee of the disputed land (Tracts One and Two), 44 Stat. 496–97; 102 Stat. 2938 *et seq.* Both pieces of legislation granted Plaintiff land adjacent to the disputed land, and the 1926 legislation granted Plaintiff 80 acres "for the occupancy and use of the Indian[s] of the Mesa Grande Reservation, known also as Santa Ysabel Reservation Numbered 1." (FAC, ¶ 14.) Beginning in 1992, Plaintiff alleges, the federal government said Mesa Grande

---

1. At the time of filing, the Secretary was Dirk Kempthorne. By an order issued February 18, 2009, his successor Kenneth Salazar was substituted as named Defendant, pursuant to Fed.R.Civ.P. 25(d).

could not make improvements on Tracts One and Two without the approval of the Santa Ysabel Band of Diegueño Mission Indians ("Santa Ysabel"), which is also a federally-recognized Indian tribe.

Plaintiff Mesa Grande alleges this had little effect on its actual use or enjoyment of the land until recently, when Santa Ysabel took actions to limit Plaintiff's access and usage of the disputed land. Apparently Plaintiff's members had been permitted to build houses and live on the disputed land. Among other things, Plaintiff alleges Santa Ysabel forbade it from conducting projects or development on the disputed land, and prohibited its members who live on the disputed land from making improvements to their homes or building fences; and beginning in 2005 Santa Ysabel began sending its own members to occupy the land. Plaintiff therefore argues it has been deprived since 2003 of the use of its land.

Plaintiff alleges it attempted to exhaust its administrative remedies in 1976 when it asked an Administrative Law Judge (the "ALJ") to order the patents cancelled and reissued in its name. (FAC, ¶ 18.) Defendant has moved to dismiss on the grounds of federal sovereign immunity, the running of the statute of limitations, and failure to join Santa Ysabel as a party. Defendant argues Santa Ysabel is an indispensable party yet cannot be joined because of its own sovereign immunity. Although the principal dispute lies between Plaintiff and Santa Ysabel, sovereign immunity prevents Plaintiff from bringing suit against Santa Ysabel. *Kiowa Tribe v. Mfg. Techs., Inc.*, 523 U.S. 751, 754, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998) (holding that, as sovereigns, Indian tribes enjoy sovereign immunity from suit unless it is abrogated or waived).

## II. Preliminary Rulings

Plaintiff moves to strike the exhibits attached to the Motion, which consist of copies of various public records, including statutes. Some of these, including the statutes and Administrative Law Judge's decision, are relied on in the FAC itself. Others consist of administrative orders and related correspondence. Plaintiff argues these documents were not the subject of a proper request for judicial notice, but this makes little difference here.

The Court can properly consider the contents of documents referred to and incorporated into the complaint provided certain conditions are met. *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir.1994). The Court may also properly take judicial notice, even *sua sponte*, of matters capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned, Fed.R.Evid. 201(c), which includes statutes. The cited statutes are readily available through reliable reference sources. The Court reviewed the statutes, and finds them useful primarily for the purpose of putting the dispute into a historical context; they do not affect the outcome of this action. Regarding exhaustion of administrative remedies, the Court looks to Plaintiff's allegations and has no occasion to rely on any of the more contentious portions of the documents attached to the FAC. The motion to strike these exhibits is therefore **DENIED** as moot.

Plaintiff's "Supplemental Brief of Authorities and Request for Oral Argument," to the extent it is a sur-reply, is unauthorized. The Court, however, construes it as simply a request for oral argument supported by a description of the arguments Plaintiff wishes to present. Plaintiff argues that the Court's order of April 15, 2009 taking this matter under submission "denies Plaintiff ... the opportunity to present certain authority re-

futing arguments made in the Government's Reply Brief...." Arguments not raised in the opening brief are ordinarily waived, *United States v. Romm*, 455 F.3d 990, 997 (9th Cir.2006), so in most cases a surreply serves little purpose. In addition, the essence of Plaintiff's first and second arguments were apparent from authorities cited in earlier pleadings, and thus were already under consideration by the Court. The Court does not reach the question discussed in the remaining argument. Thus no additional briefing or argument is required and the request for argument is **DENIED** as moot. Defendant's motion to strike the request is likewise **DENIED** as moot.

In its opposition to the Motion, Plaintiff argued Defendant had never properly responded to the FAC and therefore the arguments in the Motion are not properly before the Court. Plaintiff points out that after Defendant filed his Motion, Plaintiff then filed the FAC, and Defendant never filed a pleading responsive to that. While true, this argument overlooks Court's order of February 18, 2009. In the interests of economy, *see* Fed.R.Civ.P. 1, the Court gave Defendant the option of either withdrawing his Motion or having it deemed a motion to dismiss the FAC instead of the original complaint. (Order of Feb. 18, 2009, 2:2–5.) Defendant opted for the latter, which was permissible under the Court's order.

## III. Discussion

### A. Federal Sovereign Immunity

■■■ As a sovereign, the United States is immune from suits without its consent. *United States v. Sherwood*, 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941). This includes suits against federal officers in their official capacities to compel them to act. *Dugan v. Rank*, 372 U.S. 609, 620, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963) (citations omitted). The party asserting the claim against the United States has the burden of "demonstrating an unequivocal waiver of immunity." *United States v. Park Place Assocs., Ltd.*, 563 F.3d 907, 924 (9th Cir.2009) (quoting *Cunningham v. United States*, 786 F.2d 1445, 1446 (9th Cir.1986)).

In its opposition, Plaintiff argues the United States has waived immunity under the Administrative Procedure Act, *see* 5 U.S.C. § 702, and that neither the Quiet Title Act's exception for land held in trust for Indians, *see* 28 U.S.C. § 2409a, nor the Indian Claims Commission Act's ("ICCA") limitations period, *see* 60 Stat. 1052, section 12,[2] render the waiver ineffective. (Opp'n to Mot. to Dismiss, 8:20–11:28.) Defendant initially argued Plaintiff might be relying on the waiver of immunity in section 345 of the General Allotment Act of 1887, 25 U.S.C. § 345, but Plaintiff has not pursued this line of argument. In any event it is evident this statute cannot apply to the case at bar because it addresses allotments.

■■■ Defendant concedes § 702 of the APA would ordinarily waive his sovereign immunity, but relies on the exception embodied in the statutory language: "Nothing herein ... confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." Defendant

---

2. *See Navajo Tribe of Indians v. State of N.M.*, 809 F.2d 1455, 1460–61 (10th Cir.1987) quoting former 25 U.S.C. § 70k (1976), which provided that claims accruing before August 13, 1946 had to be presented to the Indian Claims Commission by August 13, 1951. Any not submitted by that date could not "thereaf- ter be submitted to any court or administrative agency for consideration...." This code section is omitted from the United States Code when the Commission terminated on September 30, 1978. *See* Comm. Note to § 70k.

argues the exception to the government's waiver of immunity embodied in the Quiet Title Act ("QTA") impliedly forbids the relief sought. The QTA contains its own waiver of sovereign immunity:

> The United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest, other than a security interest or water rights.

However, the waiver "does not apply to trust or restricted Indian lands...." 28 U.S.C. § 2409a(a).

Plaintiff apparently views the QTA's exception as an exception to the QTA's waiver only, with no implications for the APA. The holding of *Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands,* 461 U.S. 273, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983); *United States v. Mottaz,* 476 U.S. 834, 106 S.Ct. 2224, 90 L.Ed.2d 841 (1986) and their progeny, however, compel the conclusion that the exception in the QTA impliedly forbids the relief sought, rendering the APA's waiver inapplicable here.

■ The QTA allows the United States to be named as a party defendant in an action "to adjudicate a disputed title to real property in which the United States claims an interest, other than a security interest or water interest." An action by a putative beneficial owner against the United States would fall within the QTA's scope, because the United States, as trustee, holds legal title to trust property. *See Mottaz,* 476 U.S. at 843, 106 S.Ct. 2224 (explaining that the QTA governs disputes over land the United States holds for the benefit of others). Other circuits have also held that the QTA covers actions seeking to challenge the United States' acts of taking land into trust for tribes. *See Governor of Kansas v. Kempthorne,* 516 F.3d 833, 843 (10th Cir.2008) (in case where Kansas governor and three Indian tribes sought to challenge United States' act of

taking land into trust for Wyandotte Indian Tribe, finding the dispute fell within the scope of the Indian lands exception to the QTA).

In *Block,* the state of North Dakota argued its remedy under the QTA was not exclusive, and attempted to avoid the QTA's statute of limitations by suing under an "officer's suit" theory. The Supreme Court, after examining the legislative history concluded among other things that a waiver of immunity over suits concerning Indian lands "would not be consistent with the 'specific commitments' [the Executive branch] had made to the Indians through treaties and other agreements." 461 U.S. at 283, 103 S.Ct. 1811. The Court noted the importance attached to the limitations period. *Id.* at 283, 285, 103 S.Ct. 1811.

■ The Court also noted the general principles that conditions to waivers of sovereign immunity should be strictly observed, and exceptions thereto not lightly implied. 461 U.S. at 287, 103 S.Ct. 1811 (citations omitted). It considered Congress' "careful and thorough remedial scheme" in the QTA and its "balance, completeness, and structural integrity," and rejected the argument that it "was designed merely to supplement other judicial relief." *Id.* at 285, 103 S.Ct. 1811 (citing *Brown v. GSA,* 425 U.S. 820, 832, 833, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976)).

■ The Court therefore held that the QTA was the "exclusive means by which adverse claimants could challenge the United States' title to real property...." 461 U.S. at 286, 103 S.Ct. 1811. Most importantly, the Court specifically rejected the argument that the APA provided an alternative remedy which might be used to supplement the QTA. 461 U.S. at 286 n. 22, 103 S.Ct. 1811. The Court relied on the APA's "any other statute" provision, holding "The QTA is such an 'other statute'...." *Id.*

Three years later in *Mottaz,* the Supreme Court rejected the heart of Plaintiff's argument, that the Indian lands exception merely takes disputes over Indian trust land out of the QTA's scope:

> Nonetheless, respondent claims that her suit is not governed by the Quiet Title Act because, by its own terms, that Act "does not apply to trust or restricted Indian lands," § 2409a(a), such as the lands in which she asserts an interest. Respondent misconstrues this exclusion, which operates solely to retain the United States' immunity from suit by third parties challenging the United States' title to land held in trust for Indians.

476 U.S. at 843, 106 S.Ct. 2224. In other words, the QTA does not passively fail to waive immunity in disputes over title to trust land; rather, it actively *retains* immunity.

In *Alaska v. Babbitt (Albert),* 38 F.3d 1068 (9th Cir.1994), the Ninth Circuit interpreted *Block's* "exclusive means" language to mean that a plaintiff cannot avoid the QTA's Indian lands exception by obtaining jurisdiction under the APA. *See Alaska v. Babbitt,* 182 F.3d 672, 674 and n. 11 (9th Cir.1999) (citing *State of Alaska v. Babbitt (Albert),* 38 F.3d 1068 (9th Cir. 1994)). *Cf. Governor of Kansas,* 516 F.3d at 841 n. 4 (holding that the QTA's Indian lands exception prevents application of the APA's waiver of immunity) (citing *Mottaz,* 476 U.S. at 842, 106 S.Ct. 2224).

Plaintiff has argued some type of review should be implied, because otherwise the government's trust responsibility will be avoided. This argument cannot stand, however, because "Congress's unambiguous retention of sovereign immunity against quiet-title actions affecting trust and restricted Indian lands applies without regard to the availability of alternative means of review." 38 F.3d at 1077. Furthermore, the FAC's allegations make clear Plaintiff *has* attempted to seek re-

dress directly from the Executive branch. *See also Block,* 461 U.S. at 280, 103 S.Ct. 1811 (noting that parties claiming title to land claimed by the United States could petition Congress or the Executive for discretionary relief). The fact that these efforts proved unsuccessful does not mean they were unavailable, or that future efforts at petitioning the Executive and Congress would be futile.

The fact that Plaintiff wants to have the current patents—under which the United States is trustee and Santa Ysabel the beneficiary—canceled and reissued to name the United States as trustee and Plaintiff as beneficiary does not change the analysis. The QTA's Indian lands exception was intended to allow the United States to carry out its commitments to Indian tribes. *Block,* 461 U.S. at 283, 103 S.Ct. 1811; *Mottaz,* 476 U.S. at 842–43 and n. 6, 106 S.Ct. 2224. While issuing a land patent in favor of Plaintiff might promote this goal, it would have the effect of taking land from Santa Ysabel. Plaintiff may be tacitly viewing this action as essentially a dispute between it and Santa Ysabel, with the United States as a disinterested stakeholder. Because Plaintiff cannot proceed against Santa Ysabel, it is therefore left to proceed against the United States. Yet allowing Plaintiff or any other litigant to sue the United States to cancel a land patent issued in favor of an Indian tribe would interfere with the United States' trust commitment to that tribe, which is the very reason the United States has retained its immunity in such matters.

**B. Statute of Limitations**

Ordinarily, a motion to dismiss based on the running of the statute of limitations is properly granted where the running of the limitations period is apparent on the face of the pleadings. *Jablon v. Dean Witter & Co.,* 614 F.2d 677, 682 (9th

Cir.1980). Where, as here, immunity may foreclose jurisdiction, the Court must be especially vigilant. *See Block,* 461 U.S. at 292, 103 S.Ct. 1811 (holding that, if the QTA's statute of limitations has run, federal courts have no jurisdiction to reach the merits); *Mt. Healthy City School Dist. Bd. of Ed. v. Doyle,* 429 U.S. 274, 278, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) (holding that court is "obliged to inquire sua sponte whenever a doubt arises as to the existence of federal jurisdiction"). *See also Grosz v. Andrus,* 556 F.2d 972, 975 (9th Cir.1977) (explaining that because QTA's statute of limitations is jurisdictional, it could be raised by the court). Plaintiff argues that because statutes of limitations are affirmative defenses, Defendant bears the burden of proving it has run. Because compliance with the QTA's requirements is a condition for waiver of immunity which the Court strictly observes, this assumption is questionable. *See Kingman Reef Atoll Investments, L.L.C. v. United States,* 541 F.3d 1189, 1197 (9th Cir.2008) (declining to decide whether a plaintiff or defendant must prove timeliness for purposes of the QTA). *Cf. Myers v. United States,* 50 Fed.Cl. 674, 680 (Fed.Cl.2001) (holding that because a limitations period in a waiver of immunity goes to a court's jurisdiction, the plaintiff bears the burden of establishing the action is timely). Like the *Kingman Reef* panel, this Court need not answer the question because the evidence "overwhelmingly establishes that more than twelve years elapsed since [Plaintiff's] claim accrued." *See* 541 F.3d at 1197.

■ When legislation waiving sovereign immunity contains a statute of limitations, the limitations provision constitutes a condition on the waiver. *Block,* 461 U.S. at 287, 103 S.Ct. 1811. Such conditions are to be strictly observed, and exceptions to them are not to be lightly implied. *Id.* (citations omitted).

■ *Block, Mottaz,* and other cases closely analyze the QTA's 12–year limitations period set forth in 28 U.S.C. § 2409a(g). This section provides that an action is deemed to have accrued on the date the plaintiff "knew or should have known of the claim of the United States." Here, the United States' claim is to legal title of the disputed land as trustee for Santa Ysabel exclusively. *See Fidelity Exploration & Prod. Co. v. United States,* 506 F.3d 1182, 1182, 1186 (9th Cir.2007) (holding plaintiff's predecessor in interest knew or should have known of the United States' claim as trustee of tribal reservation land when an act of Congress established the reservation boundary).

Here, the FAC makes clear Plaintiff has known about its claim for quite a long time. Plaintiff first had notice in 1893, when the patents were first issued. (*See* FAC, ¶ 13 (alleging date of patent issue).) The allegations make clear the patents' accuracy was soon disputed, and Plaintiff had notice of the alleged error:

> The patents for the Santa Ysabel Band created by the Smiley Commission were a mistake and did not accurately reflect the intentions of the United States to issue patents for Tracts One and Two to Mesa Grande. Indeed, *almost from the start,* the Smiley Commission's conclusions were called into question[ ] by Mesa Grande and the federal government. In correspondence *from 1925 to 1971,* Defendants [*sic*] acknowledged that the land patents were made erroneously, in that the Tracts One and Two were historically occupied and used by Mesa Grande, not the Santa Ysabel Band.

(*Id.,* ¶ 14) (emphasis added).

Plaintiff alleges that it exhausted its administrative remedies when the ALJ concluded in 1976 that he could not order the reissuance of patents to the disputed

tracts, and held that a federal court would be the proper forum for such a remedy. (FAC, ¶ 18.) Although the ALJ told Plaintiff it ought to pursue its remedies in federal court, it inexplicably failed to bring suit at that time. The fact that Plaintiff asked the ALJ to order reissuance of the patents shows Plaintiff was aware of its claim at that time. Plaintiff's claim therefore accrued no later than the date in 1976 when the ALJ denied Plaintiff the relief it now seeks. *See White Mountain Apache Tribe v. Hodel,* 784 F.2d 921, 926 n. 5 (9th Cir.1986) (holding that a claim accrued when the tribe knew the government responded negatively to the tribe's request to review a disputed survey).

Even if the claim had not accrued earlier, events in the early 1990s would have sufficed to put Plaintiff on notice of its claim. In 1992, Defendant (through the Bureau of Indian Affairs) informed Plaintiff that it could not make improvements on the disputed land without the approval of Santa Ysabel. (FAC, ¶ 15.) This statement was "in direct contradiction with the past treatment of the property by the federal government. . . ." (*Id.*) This notification alone would have put Plaintiff on notice that the United States did not regard it as having clear title to the disputed land, and would have caused the claim to accrue. *See Spirit Lake Tribe v. North Dakota,* 262 F.3d 732, 738 (8th Cir.2001) (holding that claim accrued when plaintiff became aware that the government claimed an interest adverse to it, even if the claim merely clouded the title).

The FAC alleges its members previously occupied the disputed land without incident, and only recently has Santa Ysabel behaved more restrictively. (FAC, ¶¶ 15, 16.) This is apparently an effort to show Plaintiff was misled until 2003 into thinking the designation of Santa Ysabel as patentee was a mere technical error with no real consequences. (*Id.,* ¶ 15.) But

even if Plaintiff was misled, it was only misled about the consequences of not being the patentee. Under the QTA, a claim accrues on the date a plaintiff knew or should have known of the claim *of the United States.*" 28 U.S.C. § 2409a(g) (emphasis added). This was not the date disagreements arose between Plaintiff and Santa Ysabel. Nor was this the date Plaintiff began to experience the consequences of not having litigated this matter earlier. Rather, it is the date Plaintiff knew, or should have known, the United States was holding the disputed land in trust for the benefit of Santa Ysabel. With the issuance of the patents and the questions and controversy surrounding it, Plaintiff knew or should have known of its claim against the United States. Plaintiff also had indisputably clear notice when the ALJ rejected its claim, and further confirmation of this in 1992 when it was informed of restrictions on its use.

■■■ Plaintiff argues the applicable law is the APA's six-year limitations period which, it contends, is subject to an exception for continuing violations. Aside from the fact the QTA rather than the APA governs this case, application of a continuing violation exception would gut the QTA's statute of limitations. Actions against the United States to quiet title necessarily involve the United States' alleged continuing violation of a plaintiff's rights with respect to the title to property. Under Plaintiff's misguided theory, however, the United States' continuing failure to quiet the title would prevent the statute of limitations from ever running.

For these reasons, the Court holds Plaintiff's claim accrued possibly as early as 1893, but certainly no later than 1976, and the QTA's limitations period has thus run. Defendant's sovereign immunity is therefore not waived, and the Court has no

jurisdiction to grant the relief Plaintiff seeks.

## C. Other Arguments

Although Defendant has also raised arguments based on the ICCA and failure to join an indispensable party, the Court does not reach these issues. The argument based on the ICCA is cumulative of the argument based on the QTA's limitations period. And because the Court has found it lacks jurisdiction to grant the relief sought, it does not reach the issue of whether the FAC should also be dismissed for failure to join an indispensable party. *Wilbur v. Locke*, 423 F.3d 1101, 1106–07 (9th Cir.2005) (concluding that the court must decide jurisdictional issues before reaching question of joinder of indispensable party).

## IV. Conclusion and Order

Because the Court finds Defendant is shielded by sovereign immunity, Defendant's Motion to Dismiss is **GRANTED**. Because it is clear amendment cannot correct this defect, the FAC is **DISMISSED WITHOUT PREJUDICE** but **WITHOUT LEAVE TO AMEND**.

**IT IS SO ORDERED.**